**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2018 JUL 24 P 1: 56

WILLIAM W. BLEVINS
CLERK

UNITED STATES OF AMERICA and MEDICAL
ASSISTANCE PROGRAMS *ex rel.*
Jessica Albores, Marie Ford, and Margaret Whiteman, and
**JESSICA ALBORES, MARIE FORD,** and
**MARGARET WHITEMAN,** individually,

      Plaintiffs,

v.

**E.M. DIMITRI, D.O. PMC, d/b/a DIMITRI
DERMATOLOGY; AMERICAN MEDICAL
SUPPORT SERVICES, LLC; DERMATOLOGIC
CENTERS OF AMERICA, LLC; MISSISSIPPI
DERMATOLOGY, LLC; MISSISSIPPI SUPPORT
SOLUTIONS, LLC; PRECISION MEDICAL
BILLING SERVICES LLC; REGIONAL SUPPORT
SERVICES, LLC; SHAPIRO DIMITRI MEDICAL,
LLC; THE DIMITRI CLINICS, LLC; ELIZABETH
DIMITRI, D.O.; KAREN DRAKE; THOMAS
ORGERON, M.D.; JOEL PERDOMO, M.D.; and,
STEVEN SHAPIRO, M.D.,**

      Defendants.

DOCKET NO.

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

# 18 - 6936
# SECT. H MAG. 3

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiffs and *qui tam* Relators Jessica Albores, Marie Ford, and Margaret Whiteman (collectively "Relators"), by and through their undersigned counsel JTB Law Group, the Law Offices of Joe A. Flores, and Jackson+Jackson, allege of personal knowledge as to their observations and actions, and on information and belief as to all else, as follows:

## I.
## PRELIMINARY STATEMENT

Feb $400 pd

___ Process____
X Dktd____
___ CtRmDep____
___ Doc. No.____

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

1.      Elizabeth Dimitri, D.O., operates multiple dermatology clinics in the states of Louisiana and Mississippi. Dimitri committed and directed the commission of the following acts of fraud:

    a)      performing simple services across multiple sessions to increase billing;

    b)      billing for injections of Botox that were diluted beyond recommended levels;

    c)      misdiagnosing patients for the purpose of performing and billing for unnecessary services;

    d)      billing for services provided by individuals not enrolled in Medicare or Medicaid under the names of enrolled providers;

    e)      billing for services provided by nurse practitioners under the names of physicians to obtain higher levels of payment;

    f)      billing for services not provided or for higher levels of service than actually provided; and

    g)      applying inappropriate billing code modifiers to obtain higher levels of payment.

2.      In carrying out this fraud, Defendants knowingly (a) presented or caused to be presented false claims to obtain payments; (b) made or caused to be made or used false records or statements material to these false claims; and (c) conspired to cause these records or statements to be made or used, and/or these claims to be presented. A substantial number of Defendants' false claims were presented to and paid for by Medicare and Louisiana Medicaid.

3.      Relators thus bring this *qui tam* action on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), to recover treble the damages sustained by, and civil penalties and restitution owed to, the United States as a result of Defendants' fraud.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

4.      Relators also bring this *qui tam* action on behalf of the State of Louisiana under the Louisiana Medical Assistance Programs Integrity Law, La. R.S. § 46:437.1 *et seq.* (the "Louisiana MAPIL"), to recover treble the damages sustained by, and civil penalties and restitution owed to, the State of Louisiana as a result of Defendants' fraud.

5.      This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendants unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information that Relators possesses, has been served upon the Attorney General of the United States and on the United States Attorney for the Eastern District of Louisiana pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d), and upon the Louisiana Attorney General pursuant to La. R.S. § 46:439.2(A)(2).

## II.
## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, a federal statute. In addition, this Court has jurisdiction over the State claims pursuant to 31 U.S.C. § 3732(b).

7.      The Court has personal jurisdiction over Defendants because Defendants (a) are residents of, and/or are licensed to transact and do transact business in, this District; and (b) have carried out their fraudulent scheme in this District.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b)(2), because Defendants can be found in, and transact or have transacted business in this District, and the events and omissions that give rise to these claims have occurred in this District.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

9.    The Complaint has been filed within the period prescribed by 31 U.S.C. §§ 3730(h)(3) and 3731(b), and La. R.S. § 46.439.1(B).

### III.
### NO PUBLIC DISCLOSURE;
### DIRECT AND INDEPENDENT KNOWLEDGE
### OF VIOLATIONS OF THE FALSE CLAIMS ACT

10.    There has been no public disclosure, relevant under 31 U.S.C. § 3730(e) and La. R.S. § 46.439.1(D)(1), of the "allegations or transactions" in this Complaint.

11.    Relators make the allegations in this Complaint based on their own knowledge, experience and observations.

12.    Relators are the original source of the information on which the allegations herein are based, have direct and independent knowledge of such information, and have voluntarily disclosed such information to the United States and the State of Louisiana before filing this action.

### IV.
### THE PARTIES

**A.    Government Plaintiffs**

13.    Plaintiff the United States brings this action by and through Relators. At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS"), has reimbursed Defendants for the provision of various medical services and treatments for eligible individuals through the Medicare program.

14.    Plaintiff the State of Louisiana brings this action by and through Relators. At all times relevant to this Complaint, the State of Louisiana, acting through the Louisiana Medical Assistance Program ("Louisiana Medicaid"), has reimbursed Defendants for the provision of various medical services and treatments for eligible individuals through the Medicaid program.

4

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**B.    Relators**

15.    Relator Jessica Albores ("Albores") is a citizen of the United States, and a resident of Ascension Parish, Louisiana. At all relevant times, Albores has been a nurse practitioner licensed to practice in the State of Louisiana. Albores worked for Defendants at their offices in Covington, Gonzales, Gretna, Kenner, Metairie, New Orleans, and Slidell, Louisiana from approximately September 2017 until June 1, 2018.

16.    Relator Marie Ford ("Ford") is a citizen of the United States, and a resident of Lauderdale County, Mississippi. At all relevant times, Ford has been a nurse practitioner licensed to practice in the State of Mississippi. Ford has worked for Defendants at their offices in Meridian and Brandon, Mississippi from approximately October 2016 until the present day.

17.    Relator Margaret Whiteman ("Whiteman") is a citizen of the United States, and a resident of Ascension Parish, Louisiana. At all relevant times, Whiteman has been a nurse practitioner licensed to practice in the State of Louisiana. Whiteman worked for Defendants at their offices in Covington, Gonzales, Gretna, Kenner, Metairie, and Slidell, Louisiana from approximately October 2017 until June 1, 2018.

**C.    Defendants**

18.    E.M. Dimitri, D.O. PMC, d/b/a Dimitri Dermatology ("Dimitri Dermatology"), is a Louisiana professional medical corporation with its principal business address at 120 Meadowcrest Street, Suite 235, Gretna, LA 70056. Dimitri Dermatology provides dermatological services at this and seven other locations, including an office located at 2104 Gause Boulevard West, Suite A, Slidell, LA 70460.

19.    American Medical Support Services, LLC, is a limited liability company with a mailing address of 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information and

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

belief, American Medical Support Services, LLC, provides payroll, billing, and other related services for the other named Defendants.

20.     Dermatologic Centers of America, LLC, is a limited liability company with a mailing address of 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information, this company is an alias for Dimitri Dermatology.

21.     Mississippi Dermatology, LLC, is a limited liability company with a mailing address of 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information, this company is an alias for Dimitri Dermatology. Its listed members are Defendants Elizabeth Dimitri, D.O. and Steven Shapiro, M.D.

22.     Mississippi Support Solutions, LLC, is a Mississippi limited liability company. Its listed registered agent is Defendant Karen Drake, located at 1312 22nd Avenue, Suite A, Meridian, MS 39301. Its listed member is Defendant Dimitri, located at 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information, this company is an alias for Dimitri Dermatology. On information and belief, Relator Ford has received payments from Mississippi Support Solutions, LLC, in the course of her employment by Defendants.

23.     Precision Medical Billing Services LLC is a limited liability company with a mailing address of 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information and belief, Precision Medical Billing Services LLC provides payroll, billing, and other related services for the other named Defendants.

24.     Regional Support Services, LLC, is a limited liability company located at 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information and belief, Regional Support Services, LLC, provides payroll, billing, and other related services for the other named

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

Defendants. Relators Albores and Whiteman have received payments from Regional Support Services, LLC in the course of their employment by Defendants.

25.    Shapiro Dimitri Medical LLC is a limited liability company with a mailing address of 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information and belief, this company is an alias for Dimitri Dermatology. On information and belief, Relator Ford has received payments from Shapiro Dimitri Medical LLC in the course of her employment by Defendants.

26.    The Dimitri Clinics, LLC, is a Louisiana limited liability company with a mailing address of 2104 Gause Boulevard West, Suite A, Slidell, LA 70460. On information, this company is an alias for Dimitri Dermatology.

27.    Elizabeth Dimitri, D.O. ("Dimitri"), is the chief architect of the fraud alleged herein. On information and belief, Dimitri is an owner, member, and/or manager of all of the foregoing Defendant entities.

28.    Karen Drake ("Drake") lists herself on LinkedIn as the Corporate General Manager of Dermatologic Centers of America, Dimitri Dermatology, Shapiro Dimitri Medical LLC, Precision Medical Billing Service, and American Medical Support Services. **Exhibit A,** Karen Drake's LinkedIn Profile.[1] According to LinkedIn, she has held these positions since June 2011. On information and belief, Drake has directly participated in the fraud alleged herein.

29.    Thomas Orgeron, M.D. ("Orgeron") is a medical provider employed by Dimitri Dermatology and/or its alias companies. On information and belief, Orgeron has directly participated in the fraud alleged herein.

---

[1] *Available at* https://www.linkedin.com/in/karen-drake-17553069 (last accessed July 6, 2018).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

30.     Joel Perdomo, M.D. ("Perdomo"), is a medical provider employed by Dimitri Dermatology and/or its alias companies. On information and belief, Perdomo has directly participated in the fraud alleged herein.

31.     Steven Shapiro, M.D. ("Shapiro"), is a business partner of Elizabeth Dimitri. On information and belief, Shapiro is an owner, member, and/or manager of all of the foregoing Defendant entities. Shapiro also does business in the State of Mississippi under the following names:

a) Mississippi Dermatology Brandon, located at 908 Municipal Drive, Brandon, MS 39042. This business is also referred to as "The Dimitri Clinic" in online listings[2];

b) Mississippi Dermatology Meridian, located at 1312 22nd Avenue, Suite A, Meridian, MS 39301. This business is also referred to as "The Dimitri Clinic" in online listings[3]; and

c) Mississippi Dermatology Pascagoula, located at 4105 Hospital Street, Pascagoula, MS 39581.

**V.**
**THE LEGAL FRAMEWORK**

**A.     The False Claims Act**

32.     The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, (the "FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that:

---

[2]     "Mississippi Dermatology/The Dimitri Clinic," Yellow Pages, *available at* https://www.yellowpages.com/brandon-ms/mip/mississippi-dermatology-the-dimitri-clinic-538334594 (last accessed July 6, 2018).
[3]     "Mississippi Dermatology/The Dimitri Clinic," Yellow Pages, *available at* https://www.yellowpages.com/meridian-ms/mip/mississippi-dermatology-the-dimitri-clinic-475497852?lid=1001788344353 (last accessed July 6, 2018).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

    (C)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid...

31 U.S.C. § 3729(a)(1).

33.    "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id* § 3729(b)(1).

34.    For each false claim or other FCA violation, the FCA provides for the assessment of treble damages, plus a civil penalty.[4]

35.    The FCA provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

**B.**    **The Medicare Program**

*Program Overview; Provider Enrollment*

36.    In 1965 Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for certain healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

37.    The federal Department of Health and Human Services, through CMS,

---

[4] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. On January 29, 2018, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. For such penalties assessed after January 29, 2018, the minimum penalty is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 82 F.R. 3944 (Jan. 29, 2018).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

administers the Medicare program.

38.    Part B of the Medicare program authorizes payment of federal funds for outpatient health services, including services such as those provided by Defendants. Part D of the Medicare program authorizes payment for prescription medications, including injections, for Medicare beneficiaries.

39.    CMS enters into agreements with healthcare providers such as Defendants to establish their eligibility to participate in the Medicare program. Individuals or entities who are participating providers in Medicare, such as Defendants, may seek reimbursement from CMS for services rendered to patients who are program beneficiaries.

40.    To enroll as an authorized participant in Medicare Part B, a clinic or group practice is required to make the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application: Clinics/Group Practices, CMS-855B, at 31.[5]

41.    Individual providers enroll in Medicare using the form CMS-855I, or through the online Provider Enrollment, Chain and Ownership System ("PECOS"). CMS-855I contains a certification substantially similar to that in CMS-855B. *See* Medicare Enrollment Application: Physicians and Non-Physician Practitioners, CMS-855I, at 25.[6]

---

[5] *Available* at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855b.pdf (last accessed July 11, 2018).
[6] *Available* at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf (last accessed July 11, 2018).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

42.    Compliance with applicable Medicare program rules and regulations is material to the government's decision to pay and its subsequent payment of claims. In order to be reimbursable by Medicare, services must be medically necessary, must actually be provided, and must be documented in a manner that allows CMS to determine if the services are properly payable.

### *The Medicare Claims Process*

43.    In order to receive reimbursement from Medicare, providers such as Defendants must submit a claim form. *See* Form CMS-1500.[7] That claim form requires the provider to make the following certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete ... 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment [and] ... 5) the services on this form were **medically necessary** ....

*Id.*, at 2 (emphasis added).

44.    A provider may also submit the electronic equivalent of this claim form, which contains a substantially similar certification.

45.    CMS guidance as to electronic claims submission is found in Chapter 24 of the Medicare Claims Processing Manual, CMS Publication No. 100-04 (the "Claims Manual").[8] Among other things, the guidance specifies the minimum content of the enrollment form that a

---

[7] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf (last accessed July 10, 2018).
[8] *Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf (last accessed July 10, 2018).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

local Medicare Administrative Contractor or "MAC"[9] may use to sign up providers such as Defendants to submit claims electronically. Per the Claims Manual, such an enrollment form must contain, and the enrolling provider must acknowledge, at least the following statements:

> The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS' A/B MACs or CEDI:
>
> * * *
>
> 7. That it will submit claims that are accurate, complete, and truthful;
>
> * * *
>
> 12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsified or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law; [and]
>
> * * *
>
> 14. That it will research and correct claim discrepancies[.]

Claims Manual, Chapter 24 § 30.2.

46.     The submission of such a certification, if false, is a violation of the FCA. 31 U.S.C. § 3729(a).

47.     Each such false certification is a separate violation of the FCA.

**C.    Louisiana Medical Assistance Programs Integrity Law**

48.     The Louisiana Medical Assistance Programs Integrity Law (the "Louisiana MAPIL"), La. R.S. § 46:437.1 *et seq.*, provides:

> A.      No person shall knowingly present or cause to be presented a false or fraudulent claim.

---

[9] A MAC is a private insurer awarded a geographic jurisdiction to process medical claims for Medicare beneficiaries. MAC jurisdictions can be found at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Downloads/AB-MAC-Jurisdiction-Map-Oct-2017.pdf (last accessed July 6, 2018). The current MAC for this jurisdiction, in which Defendants practiced, is Novitas Solutions, Inc.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

 B. No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

* * *

 D. No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

La. R.S. §§ 46.438.3.

49. For each violation of any of the above provisions, the Louisiana MAPIL provides for the assessment of actual damages, a civil fine equal to treble damages, a separate civil monetary penalty, interest, and attorneys' fees and costs.[10] *Id.* § 46.438.6(A).

50. Like the FCA, the Louisiana MAPIL permits a private person (the "Relator") to institute a civil action on behalf of Louisiana. *Id.* § 46.439.1(A). The Relator shall receive a percentage of Louisiana's recovery. *See Id.* § 46.439(A)(1), (C)(2).

**D. The Louisiana Medicaid Program**

51. In conjunction with Medicare, Congress enacted Medicaid under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*

52. Medicaid is a jointly funded cooperative venture between the federal and state governments to provide health care to certain groups, primarily the poor and the disabled. *See* 42 C.F.R. §§ 430.0 *et seq.* Under the Medicaid program, the federal government pays a specified percentage of each state's Medicaid program expenditures. *See* 42 U.S.C. § 1396d(b).

53. Medicaid programs such as the Louisiana Medical Assistance Program ("Louisiana Medicaid") currently provide coverage for outpatient services and prescription drugs

---

[10] The civil monetary penalty is subject to inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

to eligible individuals. Individuals who are enrolled in both Medicare and Medicaid may also receive prescription drug coverage under Medicare Part D.

54.    To enroll in Louisiana as an authorized provider, an entity or business must make the following certification:

> 11. The provider agrees to conduct activities/actions in accordance with the Medical Assistance Program Integrity Law (MAPIL Louisiana R.S. Title 46, Chapter 3, Part VI-A) as required to protect the fiscal and programmatic integrity of the medical assistance programs;
>
> * * *
>
> 13. The provider understands that services and/or supplies provided must be medically necessary and medically appropriate for each individual recipient based on needs presented on the date the service is provided and/or delivered; 14. The provider agrees to charge no more for services to eligible recipients than is charged on the average for similar services to others;
>
> * * *
>
> 17. The provider agrees to report and refund any discovered overpayments within sixty (60) days of discovery[.]

Enrollment Packet for the Louisiana Medical Assistance Program: Entities/Businesses, at Addendum Page 2.[11]

55.    Individual providers must make an identical certification to enroll. *See* Enrollment Packet for the Louisiana Medical Assistance Program: Entities/Businesses, at Addendum p. 2.[12]

---

[11] *Available at* http://www.lamedicaid.com/provweb1/provider_enrollment/Enrollment_Entities.pdf (last accessed July 11, 2018).

[12] *Available at* http://www.lamedicaid.com/provweb1/provider_enrollment/Enrollment_Individuals.pdf (last accessed July 11, 2018).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## VI.
## DEFENDANTS' FRAUD

**A.    Defendants Spread Out Simple Services**
**for the Purpose of Duplicative and Wasteful Billing**

56.    Patients commonly visit Defendants' offices for the treatment of actinic keratosis ("AK"), which is a pre-cancerous skin growth caused by excessive exposure to ultraviolent radiation.

57.    Removal of AK skin growths may be accomplished using methods including cryosurgery (application of intense cold) or chemosurgery (application of chemicals).

58.    Defendants bill for the removal of AK using the following Common Procedural Terminology ("CPT") codes[13]:

a)  17000: destruction of one skin growth. The Medicare allowable amount in Louisiana for code 17000 is $63.41[14];

b)  17003: destruction of each subsequent skin growth number 2 through 14.[15] The Medicare allowable amount in Louisiana for code 17000 is $5.06;

c)  17004: destruction of 15 or more skin growths. Unlike the above codes, 17004 is a "bundled" code that is billed alone, and only once, for a procedure involving 15 or more growths. It is thus reimbursed at a significantly higher rate than 17000 or 17003. The Medicare allowable amount in Louisiana for code 17004 is $138.95.

---

[13] To obtain payment from Medicare and Medicaid, providers use Healthcare Common Procedure Coding System ("HCPCS") codes to represent the medical procedures claimed for payment. Level I HCPCS codes are identical to CPT codes. All medical procedure codes referenced in this Complaint are Level I HCPCS codes, and are thus interchangeable with CPT codes. *See* Medicare CPT/HCPCS Codes, *available at* https://www.cms.gov/ Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors-Items/CPT-HCPCS.html (last accessed July 9, 2018).

[14] *See* CMS Physician Fee Schedule, *available at* https://www.cms.gov/apps/physician-fee-schedule/search/search-results.aspx?Y=0&T=0&HT=0&CT=2&H1=17000&C=73&M=5 (last accessed July 10, 2018). The Medicare allowable amount differs varies depending on factors including the year of service, geographic area, and type of facility in which the service was performed. For the purpose of this Complaint, the relevant Medicare allowable amount is the amount charged in all parts of Louisiana outside of New Orleans.

[15] For instance, a patient who had 5 skin growths removed would be billed under 17000 once, and under 17003 four times.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

59.    Payments for AK removals are thereby "frontloaded" in the sense that the first removal is worth substantially more than each subsequent removal performed during the same session:

| Number of Growths | Total Allowable Amount | Effective Allowable Amount Per Growth |
|---:|---:|---:|
| 1 | $63.41 | $63.41 |
| 2 | $68.47 | $34.24 |
| 3 | $73.53 | $24.51 |
| * * * | * * * | * * * |
| 14 | $129.19 | $9.23 |
| 15 | $138.95 | $9.26 |
| 16 | $138.95 | $8.68 |

60.    In addition, Defendants bill for an evaluation and management ("E/M") office visit on each separate occasion the patient was treated. Defendants billed for visits using the following CPT codes:

a)  99212: established patient office visit, typically 10 minutes. The Medicare allowable amount in Louisiana for code 99212 is $42.00;

b)  99213: established patient office visit, typically 15 minutes. The Medicare allowable amount in Louisiana for code 99213 is $70.51;

c)  99214: established patient office visit, typically 25 minutes. The Medicare allowable amount in Louisiana for code 99214 is $104.30; and

d)  99215: established patient office visit, typically 40 minutes. The Medicare allowable amount in Louisiana for code 99215 is $141.19.

61.    At Dimitri's direction, Defendants' physicians and nurse practitioners deliberately and without medical necessity split up chemosurgery skin growth removal into multiple procedures. For instance, instead of removing all skin growths on the face during a single session, providers would instead remove growths on only one cheek. Defendants would then schedule follow-up visits to treat other portions of the patient's face.

16

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

62.　Defendants also fraudulently bill using code 17004 to obtain the maximum reimbursement despite performing fewer than 15 skin growth removals.

63.　Medicare establishes a 10-day post-operative global period for minor surgeries such as the removal of AK skin growths.[16] In effect, "Medicare does not allow separate payment for post-operative visits or services within 10 days of the surgery that are related to recovery from the procedure."[17]

64.　To circumvent the global period restrictions, Defendants schedule AK removal procedures such that more than 10 days elapse before a patient receives another procedure.

65.　Using this scheme, Defendants substantially increased the amount billed for their services. At the instruction of Dimitri, providers including Relators told patients that spreading out the procedure was necessary for insurance payment purposes.

66.　Defendant Thomas Orgeron, M.D., has been especially aggressive in billing for AK removals. In 2016, Orgeron billed Medicare for 520 incidences of code 17004, spread out among 176 unique beneficiaries.[18] In other words, Orgeron's average patient was billed for approximately three procedures justifying code 17004 that year, and thus purportedly had a total of 45 or more skin growths removed. In contrast, the average provider who billed Medicare under 17004 only did so 1.34 times per unique beneficiary in 2016.[19]

67.　Relator Ford has knowledge of some of the patients for whom Orgeron billed numerous incidents of 17004. Two patients who stand out in terms of excessive billing are:

---

[16] *See* CMS Global Surgery Booklet, at 5. *Available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/GloballSurgery-ICN907166.pdf (last accessed July 13, 2018).
[17] *Id.*, at 8.
[18] *See* Medicare Provider Utilization and Payment Data: Physician and Other Supplier PUF CY2016, *available at* https://data.cms.gov/Medicare-Physician-Supplier/Medicare-Provider-Utilization-and-Payment-Data-Phy/utc4-f9xp/data (last accessed July 18, 2018).
[19] *Id.*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

a) Patient Doe I: a 100-year-old patient who was billed for the removal of 145 or more skin growths between January 9, 2018 and July 16, 2018. Ford's full-body examination of Doe I revealed AK growths only on Doe I's face.

b) Patient Doe II: a 70-year-old patient who was billed for the removal of 120 or more skin growths across 8 visits between approximately April and July of 2018. For each of Doe II's examination notes, Orgeron used substantially identical and generic language to describe the patient visit. In particular, Orgeron noted that for each visit, "Time was spent educating this patient about surveillance for new potentially precancerous lesions." Orgeron then used this "education time" to justify billing for longer E/M visits.

**B.    Defendants Provided Unacceptably Low Levels of Botox to Medicaid Beneficiaries**

68.    Louisiana Medicaid covers prescriptions of OnabotulinumtoxinA (*i.e.* Botox) for beneficiaries diagnosed with conditions including axillary hyperhidrosis (excessive sweating) and chronic migraine.[20]

69.    Botox is distributed in vials containing either 100 or 200 units of dried neurotoxin complex. Before applying Botox to patients, providers must first reconstitute the Botox using saline to create an injectable solution.

70.    At Dimitri's direction, Defendants' providers administer Botox to Louisiana Medicaid beneficiaries at dilution levels of 100 Units/6 mL or 200 Units/10.5 mL. Defendants use these dilution levels regardless of whether the treatment is for axillary hyperhidrosis or migraines.

71.    Specifically, Dimitri sent the following e-mail to Defendants' providers:

The botox [*sic*] dilution is 6 cc for 100 units and 10.5 cc for 200 units.... Please understand that this dilution is standardized across all clinics to make it more difficlut [*sic*] for our nursing staff to make errors....

---

[20] *See* Louisiana Department of Health Memorandum dated Feb. 10, 2017, at 8. *Available at* http://www.lamedicaid.com/provweb1/pharmacy/Humira_and_Dysport_Policy_2-13-17.pdf (last accessed July 10, 2018).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

> Remember, you aren't the only one using the bottle and everyone is working under ther [*sic*] assumption that there are 10 units per 1/2 cc.

**Exhibit B**, Dimitri's Botox Instruction.

72.     Allergen, the manufacturer of Botox, published the following recommended dilution level for treating axillary hyperhidrosis: "The recommended dilution is 100 Units/4 mL with preservative-free 0.9% Sodium Chloride Injection…." *See* **Exhibit C**, Excerpt from Botox package insert, at 9. Applying this recommendation, each 100-unit vial of Botox should yield approximately 4 mL of injectable solution with a concentration of 2.5 units of Botox per 0.1 mL.

73.     As a result of their excessive dilution, Defendants create approximately 6 mL of solution with a concentration of 1.67 units per 0.1 mL. Despite Defendants' solution being only two-thirds of the recommendation concentration, Defendants inject axillary hyperhidrosis patients with the same volume of Botox as if it had been diluted as recommended. As a result, these patients receive substantially less than the full amount of Botox for which Louisiana Medicaid pays.

74.     Allergen also provides the following recommended dilution level for treating chronic migraines: "The recommended dilution is 200 Units/4 mL or 100 Units/2 mL, with a final concentration of 5 units per 0.1 mL…." **Exhibit C**, at 6.

75.     As a result of their excessive dilution, Defendants create approximately 6 mL of solution with a concentration of 1.67 units per 0.1 mL, or 10 mL with a concentration of 2 units per 0.1 mL. Despite Defendants' solution containing as little as one-third of the recommendation concentration, Defendants inject chronic migraine patients with the same volume of Botox as if it had been diluted as recommended. As a result, these patients receive substantially less than the full amount of Botox for which Louisiana Medicaid paid.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

76. Defendants then use the leftover Botox solution to provide cosmetic injections to patients who pay out-of-pocket. Because these injections have already been paid for by Louisiana Medicaid, Defendants earn substantial margins on these services.

77. Each vial of Botox is accompanied by a lot number. Generally, this lot number is recorded by both the pharmacy that dispensed the Botox and the provider that applies it.

78. Just like other prescriptions, each vial of Botox is intended only for the use of the patient to whom it is prescribed.

79. Defendants' log books contain entries showing that the same vial of Botox, as indicated by lot number, has been used to treat multiple patients.

**C.    Defendants Deliberately Misdiagnosed Patients to Justify Unnecessary Procedures**

80. Defendants' providers, including Dimitri, deliberately misdiagnosed Medicare and Louisiana Medicaid beneficiaries to justify and bill for unnecessary procedures.

81. As alleged above, AK skin growths may be removed using the application of chemicals. Defendants perform such a procedure using trichloroacetic acid ("TCA").

82. TCA is also used as an over-the-counter "chemical peel," to be applied to the face for cosmetic purposes.

83. Defendants' providers, including Dimitri, urge Medicare and Louisiana Medicaid beneficiaries to undergo TCA treatment for cosmetic purposes even when such patients did not suffer from AK.

84. If the patient assents to TCA treatment, as they often do after pressure from Defendants, Defendants' providers falsely document that the patient has been diagnosed with AK.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

85.    Defendants then bill for these purely cosmetic procedures using code 17004, indicating that 15 or more skin growths have been removed.

86.    Furthermore, Defendants' providers, including Dimitri and Orgeron, falsely diagnose Medicare and Louisiana Medicaid beneficiaries as suffering from pruritus. Pruritus is chronic itchiness of the skin, and may be a symptom of acne. When a patient arrives to seek treatment for acne, Defendants reflexively diagnose that patient with pruritus regardless of whether or not the patient experiences any itching.

87.    Defendants use this false diagnosis of pruritus to justify the provision of phototherapy using ultraviolet B light. Defendants bill for this phototherapy using CPT code 96910. The Medicare allowable amount in Louisiana for code 96910 is $102.73.

88.    Defendants then schedule patients for multiple follow-up visits to continue phototherapy, even though the procedure was never necessary to begin with.

89.    In addition, Defendants' providers, including Dimitri, falsely diagnose chronic migraines or axillary hyperhidrosis to accommodate patients seeking Botox solely for cosmetic purposes. By using these false diagnoses, Defendants are able to bill Louisiana Medicaid and other insurance plans for non-covered cosmetic Botox.

90.    The improper purpose of such Botox treatments is evident from their injection locations. To treat chronic migraines, Botox is injected in sites including muscles of the forehead, neck, and upper shoulders. *See* **Exhibit C**, at 7. For cosmetic treatments, Defendants inject Botox in sites including areas around the eyes and mouth. On multiple occasions, Defendants' providers, including Dimitri, have injected Botox in the eye and mouth areas of patients who were diagnosed with, and supposedly seeking treatment for, chronic migraines.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

91.     To treat axillary hyperhidrosis, Botox is typically injected in the underarm. *Id.*, at 9-10. On at least one occasion, Defendants' medical records indicated that a patient's underarms were shaved in preparation for a Botox injection to treat axillary hyperhidrosis, but also indicated that the injection was only applied to the orbicularis oris (mouth muscle).

**D.      Defendants Bill for Services Performed by Ineligible Providers**

92.     Defendants employ or contract with providers who are not enrolled as Medicare providers, and are thus ineligible to submit claims for payment to Medicare.

93.     Nevertheless, non-enrolled providers regularly render services to Medicare beneficiaries. Defendants submit the claims for such services to Medicare under the names of enrolled providers who work for Defendants, but who did not actually render or even supervise the underlying services.

94.     Alternatively, Defendants bill for services of non-enrolled providers as "incident to" the services of an enrolled provider. To be covered by Medicare, services billed as "incident to" must be "[f]urnished by the physician or by auxiliary personnel under the physician's direct supervision."[21]

95.     Similarly, Defendants' providers who are not enrolled in Louisiana Medicaid bill for services rendered to Louisiana Medicaid beneficiaries under the names of, or incident to services provided by, providers who are enrolled but did not actually provide or supervise the services.

---

[21] *See* Medicare Ch. 15, § 60.1B, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (last accessed July 13, 2018).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

**E.    Defendants Bill for Non-Physician Services under the Physician Fee Schedule**

96.    Under Medicare guidelines, a nurse practitioner ("NP") is reimbursed for services at 80 percent of the actual charge or 85 percent of the Medicare Physician Fee Schedule charge, whichever is less.[22]

97.    Under the direction of Dimitri, Defendants bill for services rendered by NPs, including Relators, under the names of physicians who did not provide or even supervise such services. Alternatively, Defendants bill for services of NPs as "incident to" the services of physicians who did not supervise such services.

98.    Defendants thereby obtained reimbursement at the full physician rate, instead of at the appropriate discounted level.

**F.    Defendants Bill for Services Not Provided or Higher Levels than Actually Provided**

99.    Defendants' providers routinely bill for services that were not actually provided.

100.    As alleged above, Defendants' providers bill using CPT code 17004, indicating that 15 or more skin growths were removed, despite performing fewer than 15 removals.

101.    Defendant Orgeron routinely bill using CPT code 10061 for the complicated incision and drainage of abscesses, even though no such procedure was performed. Orgeron billed in this manner for substantially all of his Medicare patients seeking acne treatment.

102.    Furthermore, at Dimitri's direction, Defendants' providers routinely billed for longer office visits than actually transpired.

103.    On multiple occasions, Dimitri expressed displeasure toward Relator Ford for truthfully billing E/M office visits under CPT code 99212, indicating a visit of typically 10 minutes. Dimitri told Ford to bill using 99213, indicating a visit of typically 15 minutes.

---

[22] *See* Medicare Claims Processing Manual, Ch. 12 § 120A, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf (last accessed July 10, 2018).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

104.    When an insurer, including Medicare and Medicaid, refused to cover certain procedures such as UV phototherapy, Dimitri instructed providers including Relators Albores and Ford to "upcode" E/M visits to make up for the loss. To justify upcoding, Dimitri instructed providers to falsely alter medical documentation after the fact.

## G.    Defendants Bill Using Inappropriate Coding Modifiers

105.    Medicare will reimburse for an E/M service occurring on the same day as a surgical procedure only if it is "a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure."[23]

106.    To indicate that an E/M service meets the above criterion and is therefore eligible for reimbursement, a provider must append CPT code modifier 25 to the regular E/M code.

107.    Defendants routinely, and without justification, append CPT modifier 25 to their E/M office visit billing. For instance, Defendants apply modifier 25 to substantially all E/M billing related to AK removal procedures.

108.    However, Defendants' providers do not perform significant, separately identifiable E/M services above and beyond the usual pre- and post-operative work. Instead, any E/M service provided is solely incident to or part of the underlying procedure. The lack of reimbursable E/M service is most apparent during AK removal follow-up visits, which are scheduled solely for the purpose of completing a procedure intentionally delayed for billing purposes, as alleged above.

109.    To lend credence to their use of modifier 25, Defendants' providers document irrelevant diagnoses on patient examination notes, or otherwise embellish the nature and extent of the visit. For example, Relator Ford once attended to a patient seeking phototherapy treatment

---

[23] *Id.* § 30.6.6B.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

for psoriasis. Upon finding that said patient had a history of hypertension, Dimitri instructed Relator Ford to document hypertension as the patient's primary diagnosis. This diagnosis of hypertension was used to justify a separate E/M service on top of the phototherapy treatment.

110.    As alleged above, Orgeron repetitively documented that "Time was spent educating this patient about surveillance for potentially precancerous lesions," even though said patient had received such education seven prior times.

111.    On multiple occasions, Dimitri has reprimanded Relator Albores for failing to bill for a separate E/M code in addition to the underlying procedure. Dimitri told Albores that if Albores looked hard enough, she should be able to find issues to justify additional coding.

## COUNT I
## FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

112.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

113.    As alleged above, Defendants presented claims to CMS for:

a)    performing AK removal services across multiple sessions to increase billing;

b)    misdiagnosing patients for the purpose of performing and billing for unnecessary services;

c)    billing for services provided by individuals not enrolled in Medicare under the names of enrolled providers;

d)    billing for services provided by nurse practitioners under the names of physicians to obtain higher levels of payment;

e)    billing for services not provided or for higher levels of service than actually provided; and

f)    applying inappropriate billing code modifiers to obtain higher levels of payment.

25

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

114.    For each of their claims for reimbursement, Defendants certified that the information they were providing was true, accurate and complete; and that the claim complied with all applicable Medicare laws, regulations, and instructions for payment.

115.    Each such representation was false, for the reasons described above.

116.    Accordingly, Defendants knowingly, or in reckless disregard for the truth, presented false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(l)(A).

117.    The submission by Defendants of these false claims caused CMS to pay out monies that CMS would not have paid if it had known of the falsity of Defendants' claims and certifications.

118.    Each false or fraudulent claim submitted to CMS is a separate violation of the FCA.

119.    By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in a substantial amount to be proven at trial.

**COUNT II**
**FEDERAL FALSE CLAIMS ACT: MAKING OR USING**
**<u>FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID</u>**

120.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

121.    As described above, Defendants knowingly, or in reckless disregard for the truth, used false records and statements when they submitted claims for payment, including false documentation of patients' diagnoses.

122.    Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(l)(B).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

123.    The submission of these false records or statements caused CMS to pay out monies that CMS would not have paid if it had known of the falsity of Defendants' records or statements.

124.    Each submission of a false record or statement is a separate violation of the FCA.

125.    By reason of the false or fraudulent records or statements that Defendants knowingly submitted, the United States has been damaged in a substantial amount to be proven at trial.

**COUNT III**
**FEDERAL FALSE CLAIMS ACT:**
**CONSPIRACY TO GET A FALSE CLAIM PAID**

126.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

127.    As described above, the named Defendants conspired among themselves to submit false claims in violation of 31 U.S.C. § 3729(a)(l)(C).

128.    As a result of this conspiracy, the United States has been damaged in a substantial amount to be proven at trial.

**COUNT IV**
**LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**
**PRESENTATION OF FALSE CLAIMS**

129.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

130.    As alleged above, Defendants presented claims to Louisiana Medicaid for:

    a)    performing AK removal services across multiple sessions to increase billing;

    b)    billing for injections of Botox that were diluted beyond recommended levels;

27

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

c)  misdiagnosing patients for the purpose of performing and billing for unnecessary services;

d)  billing for services provided by individuals not enrolled in Louisiana Medicaid under the names of enrolled providers;

e)  billing for services provided by nurse practitioners under the names of physicians to obtain higher levels of payment;

f)  billing for services not provided or for higher levels of service than actually provided; and

g)  applying inappropriate billing code modifiers to obtain higher levels of payment.

131.    For each of their claims for reimbursement, Defendants certified that the information they were providing was true, accurate and complete; and that the claim complied with the Louisiana MAPIL and other laws, regulations, and instructions for payment.

132.    Each such representation was false, for the reasons described above.

133.    Accordingly, Defendants knowingly, or in reckless disregard for the truth, presented false or fraudulent claims for payment in violation of La. R.S. § 46.438.3(A).

134.    The submission by Defendants of these false claims caused Louisiana Medicaid to pay out monies that Louisiana Medicaid would not have paid if it had known of the falsity of Defendants' claims and certifications.

135.    Each false or fraudulent claim submitted to Louisiana Medicaid is a separate violation of the Louisiana MAPIL.

136.    By reason of the false or fraudulent claims that Defendants knowingly presented, the State of Louisiana has been damaged in a substantial amount to be proven at trial.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## COUNT V
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### FALSE RECORD OR STATEMENT

137.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

138.    As described above, Defendants knowingly, or in reckless disregard for the truth, used false records and statements when they submitted claims for payment, including false documentation of patients' diagnoses.

139.    Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment, in violation of La. R.S. § 46.438.3(B).

140.    The submission of these false records or statements caused Louisiana Medicaid to pay out monies that Louisiana Medicaid would not have paid if it had known of the falsity of Defendants' records or statements.

141.    Each submission of a false record or statement is a separate violation of the Louisiana MAPIL.

142.    By reason of the false or fraudulent records or statements that Defendants knowingly submitted, the State of Louisiana has been damaged in a substantial amount to be proven at trial.

## COUNT VI
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### CONSPIRACY TO GET A FALSE CLAIM PAID

143.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

144.    As described above, the named Defendants conspired among themselves to submit false claims in violation of La. R.S. § 46.438.3(D)

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

145.   As a result of this conspiracy, the State of Louisiana has been damaged in a substantial amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Relators respectfully requests that this Court enter judgment in their favor and that of the United States and the State of Louisiana, and against Defendants, granting the following on all Counts:

(A)   an award to the United States for treble its damages, a statutory penalty for each violation of the FCA, and for its costs pursuant to 31 U.S.C. § 3729(a)(3);

(B)   an award to the State of Louisiana for its actual damages, a civil fine equal to treble damages, a civil monetary penalty for each violation, interest, and for its costs pursuant to La. R.S. § 46.438.6(A);

(C)   an award to Relators in the maximum amount permitted under 31 U.S.C. § 3730(d), and for the reasonable attorneys' fees, costs, and expenses they incurred in prosecuting this action;

(D)   an award to Relators in the maximum amount permitted under La R.S. §§ 46.439(A)(1) or 46.439(C)(2), and for the reasonable attorneys' fees, costs, and expenses they incurred in prosecuting this action;

(E)   awards to the United States, the State of Louisiana, and Relators for pre- and post-judgment interest at the rates permitted by law; and

(F)   an award of such other and further relief as this Court may deem to be just and proper.

[this space intentionally left blank]

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relators demands trial by jury on all questions of fact raised by the Complaint.

Dated: July 24, 2018

Respectfully submitted,

By: */s/ Mary Bubbett Jackson*
Jody Forester Jackson, (#28938)
Mary Bubbett Jackson, (# 29110)
**JACKSON+JACKSON**
201 St. Charles Avenue, Suite 2500
New Orleans, Louisiana 70170
Telephone: (504) 599-5953
Fax:  (888) 988-6499
*jjackson@jackson-law.net*
*mjackson@jackson-law.net*

**JTB LAW GROUP - BROWN LLC**
Jason T. Brown
    (*pro hac vice* application forthcoming)
Benjamin Lin
    (*pro hac vice* application forthcoming)
Patrick S. Almonrode
    (*pro hac vice* application forthcoming)
155 2nd Street, Suite 4
Jersey City, NJ 07302
(877) 561-0000 (office)
(855) 582-5297 (fax)
*jtb@jtblawgroup.com*
*ben.lin@jtblawgroup.com*
*patalmonrode@jtblawgroup.com*

**LAW OFFICES OF JOE A. FLORES**
Joe A. Flores
    (*pro hac vice* application forthcoming)
500 N. Water Street, Suite 515
Corpus Christi, TX 78478
(361) 887-8670 (office)
(361) 887-8651 (fax)
*jaflores0756@sbcglobal.net*

*Attorneys for Relators*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2018, I caused a true copy of the Complaint in the matter captioned *United States of America and Medical Assistance Programs ex rel. Jessica Albores, et. al. v. E.M. Dimitri, D.O. PMC, et al.* to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relators:

*by hand delivery to*

Duane A. Evans
United States Attorney's Office
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130

*by USPS Registered Mail, Return Receipt Requested, to*

Jeff Landry
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, LA 70802

Office of the Attorney General of the United States
United States Department of Justice
950 Florida Avenue, NW
Washington, DC 20530-0001

/s/Mary Bubbett Jackson
Mary Bubbett Jackson