UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| United States of America and the State of Louisiana,<br><br>Plaintiffs,<br><br>*ex rel*. Jessica Albores, Marie Ford, and Margaret Whiteman, individually,<br><br>v.<br><br>E.M. Dimitri D.O. PMC d/b/a Dimitri Dermatology; American Support Services, LLC; Dermatologic Centers of America, LLC; Mississippi Dermatology, LLC; Mississippi Support Solutions, LLC; Precision Billing Services, LLC; Regional Support Services, LLC; Shapiro Dimitri Medical, LLC; The Dimitri Clinics, LLC; Elizabeth Dimitri, D.O.; Thomas Orgeron, M.D.; and Joel Perdomo, M.D.,<br><br>Defendants. | Civil Action No. 18-cv-06936<br><br>Section "H" (3)<br><br>Judge Milazzo<br><br>Magistrate Dossier |

**FIRST AMENDED JOINT COMPLAINT**
**BY THE UNITED STATES AND THE STATE OF LOUISIANA**

NOW INTO COURT, through the undersigned Assistant United States Attorney and the undersigned Assistant Attorney General, come the United States of America and the State of Louisiana, with a First Amended Joint Complaint this *qui tam* action.

## Introduction

The United States and the State of Louisiana intervene in this action to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*. and Louisiana's

Medical Assistance Programs Integrity Law, La. R.S. 46:437.1, *et seq*., respectively, for false and fraudulent claims that Defendants knowingly submitted, or caused to be submitted, for medically unnecessary dermatological procedures and visits performed by employees of, and medical providers contracted by, Defendant E.M. Dimitri, D.O. PMC in Louisiana and Mississippi from January 1, 2016 through the date of this filing.

Specifically, Defendants engaged in a pattern and practice of billing Louisiana Medicaid, Mississippi Medicaid, Medicare, and TRICARE for phototherapy and photochemotherapy procedures that were performed at subtherapeutic doses and at subtherapeutic intervals on thousands of Louisiana and Mississippi residents. Further, E.M. Dimitri, D.O. PMC's contracted physicians and midlevel providers, acting at Defendant Elizabeth Dimitri, D.O.'s direction and guidance, and with her knowledge, engaged in a pattern and practice of treating Medicaid patients who presented for treatment of acne by asking them to return every two-to-four weeks to receive (1) a glycolic acid peel for which neither the beneficiary nor the respective government payors were charged, (2) 30 seconds of phototherapy, and (3) a minor surgical procedure allegedly involving the incision and drainage of an abscess. During the latter procedure, the physicians, midlevel providers, and the medical assistants operating at the direction of those physicians and midlevel providers, claimed to incise and to drain one or more epidermal cysts using nothing but the readily-available skincare tools of an acne lancet and a Schamberg extractor, colloquially known as a "pimple popper."

The repeated performance of these treatments — as described in the medical records and for the diagnoses claimed — fell well outside of the "generally accepted evidence-based medical standards" required by the State of Louisiana, La. Admin. Code tit. 50, pt. I, § 1101(a), the "standards of acceptable medical practice" required by the State of Mississippi, 23 Miss. Admin.

Code Pt. 200, R. 5.1, the "professionally recognized standards" required by Medicare, 42 C.F.R. § 1004.10(b), and the "generally accepted norms for medical practice in the United States" required by the TRICARE program, 32 C.F.R. § 199.2(b).

**Jurisdiction and Venue**

1. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345 and 1367(a) because Plaintiffs allege violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*., and Louisiana's Medical Assistance Program Integrity Law, La. R.S. 46:438, *et seq*.

2. The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because the Defendants reside, previously resided in, and/or transacted business in the Eastern District of Louisiana, and committed acts within this District that render them liable under 31 U.S.C. § 3729, *et seq*.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because several of the Defendants reside in and/or are entities organized within this District, and a substantial part of the events giving rise to this action occurred in the Eastern District of Louisiana.

**Parties**

4. The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS"), which administers the Medicare program, and funds a significant portion of the Louisiana and Mississippi Medicaid programs, through the Centers for Medicare & Medicaid Services ("CMS"); and on behalf of the Department of Defense ("DOD"), which administers the TRICARE program through the Defense Health Agency ("DHA").

5. Attorney General Liz Murrill brings this action on behalf of the State of Louisiana, which administers the Louisiana Medicaid program. La. R.S. 46:438.1(A).

6. Relator Jessica Albores ("Albores") is a citizen of the United States, and a resident of Ascension Parish, Louisiana. She is a nurse practitioner licensed by the State of Louisiana. Albores was contracted to provide medical services for E.M. Dimitri, D.O. PMC from approximately September 2017 until June 2018. During that time, Albores worked in the Covington, Gonzales, Gretna, Kenner, Metairie, New Orleans, and Slidell, Louisiana clinics.

7. Relator Marie Ford ("Ford") is a citizen of the United States, and she is currently a resident of Houston County, Texas. At all times relevant to this matter, Ford resided in Mississippi and was a nurse practitioner licensed by the State of Mississippi. Ford was contracted to provide medical services for E.M. Dimitri, D.O. PMC from approximately October 2016 until August 2018. During that time, Ford worked at the Meridian and Brandon, Mississippi clinics.

8. Relator Margaret Whiteman ("Whiteman") is a citizen of the United States, and a resident of St. Tammany Parish, Louisiana. She is a nurse practitioner licensed by the State of Louisiana. Whiteman was contracted to perform medical services for E.M. Dimitri, D.O. PMC from approximately October 2017 until June 2018. During that time, Whiteman worked in the Covington, Gonzales, Gretna, Kenner, Metairie, and Slidell, Louisiana clinics.

9. On July 24, 2018, the Relators filed this action alleging violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*. and Louisiana's Medical Assistance Program Integrity Law, La. R.S. 46:437, *et seq*., on behalf of themselves, the United States, and the State of Louisiana, pursuant to the *qui tam* provisions of the respective statutes.

10. E.M. Dimitri, D.O., PMC ("Dimitri Dermatology") is a professional medical corporation organized in the state of Louisiana in 2004. Dimitri Dermatology's principal place of business is 2104 Gause Blvd. West, Suite A, Slidell, LA 70406. Defendant Elizabeth Dimitri, D.O. ("Dimitri") is the President, Director, and sole officer of the corporation, and Karen Drake

("Drake") is the Registered Agent. Dimitri Dermatology, acting through its medical assistants, contracted physicians, and contracted midlevel providers, furnished dermatological services at clinics located in Kenner, New Orleans, Gretna, Slidell, Covington, Bogalusa, Metairie, and Gonzales, Louisiana. Dimitri Dermatology also furnished dermatological services at clinics located in Bay St. Louis, Meridian, Brandon, Gulfport, and Pascagoula, Mississippi. During the relevant timeframe, Dimitri Dermatology was registered to operate under one or more of the following fictitious business names in Mississippi: the Dimitri Clinics, Mississippi Skin Clinic and Psoriasis Center of Gulfport, Mississippi Skin and Psoriasis Center of Gulfport, Mississippi Skin and Psoriasis Center of Meridian, Mississippi Skin and Psoriasis Center of Brandon, Mississippi Skin and Psoriasis Center of Bay St. Louis, and Mississippi Skin and Psoriasis Center of Pascagoula. The overwhelming majority of the claims at issue in this case were submitted for payment through Dimitri Dermatology's NPI or Tax Identification Number.

11. Defendant American Support Services, LLC *fka* American Medical Support Services, LLC ("AMSS"), is a limited liability company organized in the state of Louisiana in 2014. The company's domicile and mailing address is 2104 Gause Blvd. West, Suite A, Slidell, LA 70406. Dimitri was identified as the sole Member/Manager until February 27, 2022, at which time the registration was amended to name Constance Smallwood as the Member/Manager. Karen Drake is the Registered Agent.

12. Dermatologic Centers of America, LLC ("DCA") is a limited liability company organized in the state of Louisiana in 2012. The company's domicile and mailing address is 2104 Gause Blvd West, Suite A, Slidell, Louisiana 70406. Dimitri was identified as the sole Member/Manager until February 27, 2022, at which time the registration was amended to also include Karen Drake as Member/Manager. Karen Drake is also the Registered Agent.

13. Mississippi Dermatology, LLC is a limited liability company organized in the state of Louisiana in 2012. The company's domicile and mailing address is 2104 Gause Blvd West, Suite A, Slidell, Louisiana 70406. Dimitri is the sole Member/Manager and Karen Drake is the Registered Agent. During the relevant timeframe, Mississippi Dermatology, LLC registered the following fictitious business names in Mississippi: Mississippi Dermatology Bay St. Louis, Mississippi Dermatology of Bay St. Louis, Mississippi Dermatology Bay St. Louis and General Medical Group, Mississippi Dermatology Brandon, Mississippi Dermatology Meridian, Mississippi Dermatology of Meridian, and Mississippi Dermatology Pascagoula.

14. Mississippi Support Solutions, LLC ("MSS") is a limited liability company organized in the state of Mississippi in 2018. Its principal place of business is 1312 22nd Avenue, Suite A, Meridian, Mississippi 39581. Dimitri is the sole Member/Manager and Karen Drake is the Registered Agent. In 2020, the company registered the following fictitious business names in Mississippi: Mississippi Skin and Psoriasis Center of Meridian, Mississippi Skin and Psoriasis Center of Pascagoula, and Mississippi Skin and Psoriasis Center of Brandon. Upon information and belief, employees of AMSS and Precision Billing Services, LLC performed administrative and billing functions of MSS while situated in the Louisiana clinics. Relator Ford received payments from MSS during her contract with Dimitri Dermatology.

15. Precision Billing Services, LLC *fka* Precision Medical Billing Services, LLC ("PMBS") is a limited liability company organized in the state of Louisiana in 2013 with a domicile of 2104 Gause Blvd West, Suite A, Slidell, Louisiana 70406. Dimitri was identified as the sole Member/Manager until February 27, 2022, when the registration was amended to name Constance Smallwood as the Member/Manager. Upon information and belief, PMBS employees operating

out of the Louisiana clinics billed the government payors for the services performed at the clinics in both Louisiana and Mississippi.

16. Regional Support Services, LLC ("RSS") is a limited liability company organized in the state of Mississippi in 2018. Its principal address is 2104 Gause Blvd West, Suite A, Slidell, Louisiana 70406. Dimitri is identified variously as its Manager and/or President in its filings and Karen Drake is identified variously as the Registered Agent, the Manager, and the Secretary. During the relevant timeframe, RSS registered the following fictitious business names in Mississippi: Mississippi Skin Clinic and Psoriasis Center of Gulfport, Mississippi Skin and Psoriasis Center of Gulfport, Mississippi Skin and Psoriasis Center of Bay St. Louis, Mississippi Skin and Psoriasis Center of Meridian, Mississippi Skin and Psoriasis Center of Brandon, and Mississippi Skin and Psoriasis Center of Pascagoula. Relators Albores and Whiteman received payments from RSS during their contracts with Dimitri Dermatology.

17. Shapiro Dimitri Medical, LLC was a limited liability company organized in the state of Louisiana in 2012. The company's domicile and mailing address was 2104 Gause Blvd. West, Suite A, Slidell, Louisiana 70406. Dimitri and Defendant Seven Shapiro, M.D. were both identified as Member/Manager until the company was voluntarily dissolved in 2020. Karen Drake was the Registered Agent. Prior to its dissolution, but during the timeframe relevant to this Complaint, Shapiro Dimitri Medical, LLC registered the following fictitious business names in Mississippi: Mississippi Skin and Psoriasis Center of Meridian, Mississippi Skin and Psoriasis Center of Brandon, and Mississippi Skin and Psoriasis Center of Pascagoula, Mississippi Dermatology Brandon, Mississippi Dermatology Meridian, and Mississippi Dermatology Pascagoula. Upon information and belief, employees of AMSS and PMBS performed the

administrative and billing functions of Shapiro Dimitri Medical, LLC, while situated in the Louisiana clinics.

18. The Dimitri Clinic, LLC is a limited liability company organized in the state of Louisiana in 2016. The company's domicile and mailing address is 2104 Gause Blvd. West, Suite A, Slidell, Louisiana 70406. Dimitri is the sole Member/Manager and Karen Drake is the Registered Agent.

19. Elizabeth Dimitri, D.O. is the chief architect of the fraud alleged herein. Dimitri is, or was, an Officer, Member, Manager, President, and/or Director of each of the defendant entities named in the complaint during the relevant timeframe. Dimitri directly participated in the fraud through the administration of unnecessary medical services, the training/guidance of less-experienced providers, the management and direction of lower-level staff and contracted providers, and as the owner of the companies through which the false claims were submitted. Dimitri personally treated patients in both Louisiana and Mississippi. Dimitri is identified as the "Supervising Physician" in the "Clinical Practice Guidelines" signed by every physician assistant that was hired to work at the clinics.

20. Defendant Thomas Orgeron, M.D. ("Orgeron") has been contracted to perform medical services for Dimitri Dermatology since 2012. He is a resident of St. Tammany Parish, Louisiana. He has, or did have, an ownership interest in Dimitri Dermatology and RSS during the relevant timeframe. Defendant Orgeron treated patients in both Louisiana and Mississippi. Defendant Orgeron directly participated in the fraud, both through the administration of unnecessary medical services and the training/guidance of less-experienced midlevel providers.

21. Defendant Joel Perdomo, M.D. ("Perdomo") has been contracted to perform medical services for Dimitri Dermatology since 2015. He is a resident of Louisiana. Defendant

Perdomo directly participated in the fraud, both through the administration of medical services and the training/guidance of inexperienced midlevel providers. Defendant Perdomo treated patients in Louisiana and Mississippi. Perdomo is identified as the "Back-Up Physician" in the "Clinical Practice Guidelines" signed by every physician assistant that was hired to work at the clinics.

**Regulatory Framework**

**I. The Medicaid Program**

22. In 1965, Congress established the Medicaid program under Title XIX of the Social Security Act ("the Act"), 42 U.S.C. § 1396, *et seq*., to help states provide medical assistance to residents unable to afford necessary medical services. Medicaid serves as the nation's primary source of health insurance for low-income populations.

23. Under the Act, Medicaid funding is shared between the state and federal governments. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42. U.S.C. § 1396d-(b). Each claim submitted for payment to the Louisiana and Mississippi Medicaid programs is paid with both state and federal dollars, according to the applicable FMAP.

24. Medicaid providers submit claims for payment to states, which pay the claims and obtain the federal portion of the payment from accounts that draw on the United States Treasury. After the end of each calendar year, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount to reconcile the estimated expenditures with the actual expenditures. 42 C.F.R. § 430.30.

25. The federal enabling regulations of the Medicaid program require health care providers to assure that they provide services only when "medically necessary" and that the

services "will be of a quality which meets professionally recognized standards of health care." 42 C.F.R. §§ 1004.10(a), (b).

26. The federal government placed responsibility on each state to structure the Medicaid program within statutorily specified parameters, including defining medical necessity under their respective state laws. 42 U.S.C. § 1396a; 42 C.F.R. § 440.230(d).

27. CMS developed the National Provider System, which issues a unique health identifier for health care practitioners, known as the National Provider Identifier ("NPI"). All group practices, physicians, and non-physician providers must have an assigned NPI number when enrolling with a government payor. Group practices, like Dimitri Dermatology, can also use their Tax Identification Number ("TIN") to submit claims.

28. When submitting claims to government payors, providers must identify the Current Procedural Terminology (CPT code) for the procedures or services performed. The CPT codes are maintained by the American Medical Association.

29. Government payors will reimburse for an evaluation and management ("E&M") service occurring on the same day as a procedural service only if it is "a significant, separately identifiable E&M service that is above and beyond the usual pre- and post-operative work of the procedure[.]" Medicare Claims Processing Manual, Ch. 12 § 30.6.6B; Medicare NCCI 2023 Coding Policy Manual, Chapter 11, p. 31.

30. To indicate that an E&M service meets the above criteria and is therefore eligible for additional reimbursement, a provider must append the CPT code modifier 25 to the E/M code.

## II. Louisiana Medicaid

31. The Louisiana Department of Health ("LDH") oversees the administration of the Medicaid program in Louisiana pursuant to La. R.S. 36:254. The United States, through CMS,

provided 62.21% – 67.7% of the funds used by the Louisiana Medicaid program to provide medical assistance to Louisiana Medicaid beneficiaries during the relevant timeframe.

32. The State of Louisiana defines "medically necessary services" as those health care services that "are in accordance with generally accepted evidence-based medical standards or that are considered by physicians (or other independent licensed practitioners) within the community of their respective professional organizations to be the standard of care." La. Admin. Code tit. 50, pt. I, § 1101. To be considered medically necessary, services must be:

> 1. deemed reasonably necessary to diagnose, correct, cure, alleviate or prevent the worsening of a condition or conditions that endanger life, cause suffering or pain or have resulted or will result in handicap, physical deformity, or malfunction; and 2. those for which no equally effective, more conservative and less costly course of treatment is available or suitable.

*Id*. at (B). Services "must be individualized, specific and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and neither more nor less than what the recipient requires at that specific point in time" to be considered medically necessary. *Id*. at (C). Cosmetic services are specifically excluded from coverage. *Id*. at (D).

33. LDH contracts with Managed Care Organizations (MCOs) to manage most of the health benefits the Louisiana Medicaid program provides to beneficiaries.

34. Six MCOs manage the physician services at issue in this case: Aetna Better Health of Louisiana, AmeriHealth Caritas Louisiana, Inc., Community Care Health Plan of Louisiana (also known as "Healthy Blue"), Humana Health Benefit Plan of Louisiana, Inc. (also known as "Humana Healthy Horizons in Louisiana"), Centene Corporation (also known as "Louisiana Healthcare Connections"), and UnitedHealthcare Community Plan.

35. Providers execute contracts with each of the MCOs and, in so doing, verify that they are credentialed, qualified to perform the services for which they will seek reimbursement, and that the services they provide will be medically necessary.

36. In Louisiana, the MCOs are required to use the medical necessity definition that is set forth in Section 1101 of the Louisiana Administrative Code. La. Admin. Code, tit. 50, pt. I, § 3507(H)(3).

37. When seeking reimbursement for services provided, practitioners submit claims to the MCOs on Form CMS 1500 or its electronic equivalent, 837P. Practitioners are compensated for outpatient physician's services on a fee-for-service basis that is determined by Louisiana Medicaid's fee schedule.

38. Form CMS 1500 requires providers to identify the patient's diagnoses and the CPT code of the services performed, any relevant modifiers, the NPI of the provider that rendered the services, and the NPI or TIN of the billing provider.

39. CMS Form 1500, and its electronic equivalent, requires Medicaid providers to certify that (1) the information provided is "true, accurate, and complete"; (2) the service was "medically indicated and necessary to the health of the patient"; and (3) the service was personally furnished by the physician (or under the physician's immediate supervision). https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf (last visited August 1, 2024).

40. The providers must further acknowledge their awareness that "any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal or State laws[,]" and that they will keep "such records as are necessary to disclose fully

the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed" as the State Agency may request. *Id*.

## III. Mississippi Medicaid

41. The Office of Governor, Division of Medicaid ("DOM") oversees the administration of the Mississippi Medicaid program pursuant to Miss. Code Ann. § 43-13-121. The United States, through CMS, provided 74.17% - 84.37% of the funds used by the Mississippi Medicaid program to provide medical assistance to beneficiaries during the relevant timeframe.

42. Mississippi Medicaid defines "medically necessary services" as health care services "that a provider, exercising prudent clinical judgment, would provide to a patient for the purpose of evaluating, diagnosing, or treating an illness, injury, disease or its symptoms, and that are:

> 1. Appropriate and consistent with the diagnosis . . . and the omission of which could adversely affect the patient's medical condition, 2. Compatible with the standards of acceptable medical practice in the United States, [and] 3. Provided in a safe, appropriate and cost-effective setting given the nature of the diagnosis and the severity of the symptoms.

23 Miss. Admin. Code Pt. 200, R. 5.1. To obtain reimbursement for rendered services from Mississippi Medicaid, there must also be "no other effective and more conservative or substantially less costly treatment service and setting available." *Id*. at R.5.1(B)(6). Like LDH, DOM specifically excludes services that are cosmetic in nature. *Id*. at R.5.1(B)(7).

43. DOM also utilizes a managed-care program to provide Medicaid benefits to its beneficiaries, although approximately 35% of Mississippi beneficiaries still receive benefits under the traditional Medicaid fee-for-service program administered directly by the state. Miss. Code. Ann. § 43-13-117(H)(1); https://medicaid.ms.gov/resources/ (last visited August 10, 2024). The

three MCO's that manage benefits for the physician's services at issue in this case are UnitedHealthCare Community Plan, Magnolia Health, and Molina Health.

44. Providers are required to complete a Medical Assistance Participation Agreement, in which they certify that "all Medicaid covered services have been administered and billed in accordance with Medicaid policy, to include but not limited to, disclosing the appropriate provider NPI in each applicable section of the claim submission." https://medicaid.ms.gov/wp-content/uploads/2022/10/Medical-Assistance-Participation-Agreement.pdf (last visited August 10, 2024). Providers are "responsible for validity and accuracy of claims submitted on paper, electronically or through a billing service." *Id*. Further, the provider certifies that they have "reviewed all documents related to participation in the Medicaid . . . program[] to include but not limited to, the Administrative Code and Billing Manuals located at www.medicaid.ms.gov and agrees to be bound by the current versions as well as any amendments, revisions, etc. of such documents." *Id*.

45. Mississippi MCOs are statutorily required to "use a clear set of level of care guidelines in the determination of medical necessity . . . that are consistent with widely accepted professional standards of care." Miss. Code. Ann. § 43-13-117(H)(1).

46. Mississippi Medicaid providers also submit their claims for reimbursement using Form CMS 1500 or its electronic equivalent, 837P and, in so doing, provide the same information and certifications described *infra* in Paragraphs 40 and 41.

**IV. The Medicare Program**

47. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.

48. Medicare Part B reimburses providers for the physician services at issue in this case. 42 U.S.C. § 1395k(a)(2)(B)(i).

49. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

50. To enroll in Medicare, group practices such as Dimitri Dermatology must submit a Medicare Enrollment Application, Form CMS-855B. Physicians and non-physician providers, such as the doctors, nurse practitioners, and physician assistants with whom Defendant Dimitri Dermatology contracts to perform services, must submit a similar application, Form CMS-855I.

51. Both forms require the signatories to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . . I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855b.pdf (last visited August 1, 2024) and https://www.cms.gov/Medicare/cms-forms/cms-forms/Downloads/cms855i.pdf (last visited August 1, 2024).

52. An authorized official must certify Form CMS-855B for the initial enrollment application, which "legally and financially binds [the official] to all of the laws, regulations, and program instructions of the Medicare program." https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855b.pdf (last visited August 1, 2024). The authorized official may delegate someone to report changes or updates to the group practice's record thereafter. Once delegated, that person's certification carries the same binding effect.

53. Form CMS-855I requires the physician or non-physician provider to personally certify that the individual "agree[s] to abide by the Medicare laws, regulations, and program instructions . . . ." The authority to certify this form cannot be delegated. https://www.cms.gov/Medicare/cms-forms/cms-forms/Downloads/cms855i.pdf (last visited August 1, 2024).

54. Benefits obtained under Medicare Part B are administered by Medicare Administrative Contractors ("MACs"). The MAC for Defendants' Medicare Part B claims for the relevant timeframe was Novitas Solutions ("Novitas").

55. Medicare Part B only covers physician services that are reasonable and necessary for the diagnosis or treatment of an illness. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). Novitas instructs providers that, where no specific billing or coding guidance as to a particular treatment or procedure exists, payment is "made only for services that are medically reasonable and necessary." https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00247306 (last visited August 4, 2024) ("In the absence of a Local Coverage Determination, National Coverage Determination, billing and coding article or CMS manual instruction, [National Correct Coding Initiative] or [Medically Unreasonable Edits], reasonable and necessary guidelines still apply.")

56. Novitas specifies that it:

> will determine if an item or service is "reasonable and necessary" under § 1862(a)(1)(A) of the Act if the service is: safe and effective . . . appropriate, including the duration and frequency in terms of whether the service . . . is furnished in accordance with accepted standards of medical practice for the diagnosis and treatment of the beneficiary's condition . . . ordered and furnished by qualified personnel; and one that meets, but does not exceed, the beneficiary's medical need.

*Id.*

57. Providers that bill Medicare Part B are compensated for physician's services on a fee-for-service basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. As with the state Medicaid programs, providers submit Form CMS 1500 or its electronic equivalent to obtain reimbursement from the applicable MAC. Medicare providers must certify that "(1) the information on [the claim] is true, accurate and complete;" that they have familiarized themselves with "all applicable laws, regulations, and program instructions, which are available from the [MAC,]" and that the claim, "whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare . . . laws, regulations, and program instructions for payment." https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf (last visited August 1, 2024). They must also certify that "the services "were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision . . . ." *Id*. Finally, the certification acknowledges that "[a]ny one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine or imprisonment under applicable Federal laws." *Id*.

58. The provider bears the responsibility to show, by their records, that the services were reasonable and necessary. 42 U.S.C. § 1359l(e); 42 C.F.R. § 424.5(a)(6).

**V. The TRICARE Program**

59. TRICARE is a medical benefits program established by 10 U.S.C. §§ 1071-1110b and administered by the DHA. TRICARE beneficiaries generally include active duty and retired members of the Uniformed Services and their dependents. The United States funds the cost of health care services and prescription medications provided to TRICARE beneficiaries, although beneficiaries under certain plans may be responsible for co-pays or deductibles. *See* 32 C.F.R. §

199.17 (explaining the four TRICARE plans, the benefits thereunder, and the categories of people who are eligible for coverage under the program).

60. TRICARE covers only medically necessary and "appropriate medical" care. 32 C.F.R. § 199.4(a)(1)(i). TRICARE defines "appropriate medical care" as "services performed in connection with the diagnosis or treatment of disease or injury . . . which are in keeping with the generally accepted norms for medical practice in the United States." 32 C.F.R. § 199.2(b). The provider must be qualified to perform [the] medical services by reason of his or her training and education and [] licensed or certified by the state where the service is rendered . . . ." *Id*. The services must be furnished economically, in the least expensive level of care . . . to provide the required medical care regardless of whether or not that level of care is covered by [TRICARE]." *Id*.

61. As with the other government payors, providers submit claims to TRICARE using the CMS 1500 or its electronic equivalent. Providers must make the same certifications when submitting claims to TRICARE as they make when submitting claims to Medicare, described *infra* in Paragraphs 52–54, and 58.

62. The state Medicaid programs, Medicare, and TRICARE receive millions of claims each year, so the programs cannot scrutinize every claim that they receive. The front end of the reimbursement system is based on trust and certifications. The program relies on providers to comply with the medical necessity requirements and to submit truthful and accurate certifications and claims.

## Applicable Law

### I. The False Claims Act

63. The False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., provides that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A), (B) . . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a).

64. "Knowingly," within the meaning of the FCA, includes actual knowledge, deliberate ignorance of the truth or falsity of the information, and reckless disregard as to the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). The FCA does not require the government to show a specific intent to defraud. *Id*. at § 3729(b)(1)(B).

65. The FCA civil penalties range from $13,946 to $27,894 per false claim depending on the time of the violation and the time of the assessment of the penalty. 28 C.F.R. Part 85.5, Table I, https://www.ecfr.gov/current/title-28/chapter-I/part-85/section-85.5 (last visited August 11, 2024); *see also* the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999)(establishing that FCA civil penalties are adjusted due to inflation).

## II. Louisiana's Medical Assistance Program Integrity Law

66. Louisiana's Medical Assistance Program Integrity Law ("MAPIL"), La. R.S. 46:437, *et seq*. prohibits the reckless, deliberately ignorant, or intentional submission of false or

fraudulent claims and false statements in order to obtain or keep Medicaid funds. It provides, in pertinent part, that:

> A. No person shall knowingly present or cause to be presented a false or fraudulent claim;
>
> B. No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
>
> C. No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money . . . to [Medicaid]; [and]
>
> D. No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain payment for a false or fraudulent claim . . . .

La. R.S. 46:438.3.

67. Any entity or person that violates the provisions of La. R.S. 46:438.2 or 438.3 is liable to the state for:

> a. actual damages, defined as the difference between what the Medicaid program paid, or would have paid, and the amount that should have been paid had a violation not occurred; plus interest at the maximum rate of legal interest…from the date the damage occurred to the date of repayment, and
>
> b. a civil fine not to exceed three times the amount of the actual damages sustained by the Medicaid program, and
>
> c. a civil monetary penalty of not less than $5,500 dollars but not more than $11,000 dollars for each false or fraudulent claim, as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and payment of interest on the amount of the civil fine imposed pursuant to La. R.S. 46:438.6(B) at the maximum rate of legal interest. . .from the date the damage occurred to the date of repayment.

La. R.S. 46:438.6; La. R.S. 13:4202(B)(1).

**Specific Allegations**

**I. Dimitri's Knowledge and Control**

68. Defendant Dimitri is a Doctor of Osteopathy. She is not board-certified by the American Board of Medical Specialties ("AMBS") in dermatology and, as such, is not permitted by either Louisiana or Mississippi to advertise herself as a board-certified dermatologist. Mehdi Mosadegh, M.D. is the only AMBS board-certified dermatologist associated with any of Dimitri Dermatology's 13 clinics. The claims data indicates that Dr. Mosadegh is also the only Dimitri provider that does not routinely perform the medically unnecessary procedures described in this complaint.

69. No ABMS board-certified dermatologist performs services at the Mississippi clinics, so the state does not permit Dimitri Dermatology to use "dermatology" in the branding of those five clinics. The Mississippi clinics operate under a version of the fictitious business names "Mississippi Skin and Psoriasis Center" or "the Dimitri Clinic."

70. Dimitri exercised significant control over the operation of her clinics. She was directly involved in the hiring of new practitioners, personally trained new physicians and midlevel providers, involved herself in the daily operations of the clinics, closely controlled "the billing department," orchestrated responses to audits, held regular meetings with the "management" of her other companies that operated her clinics, "bounced around" to each location, prevented physicians and midlevel providers from reviewing claims submitted for their services, and accessed medical records after the clinics were closed.

71. Dimitri, acting through her medical corporation and her various limited liability companies, and with the assistance of General Manager Karen Drake, generally hired physicians, midlevel providers, medical assistants, and billers/coders with marginal to no experience in

dermatology. New contractors and employees were then trained to perform medically unnecessary services and/or to upcode the procedures and the services that were performed.

72. For instance, when a former Billing Manager, who was technically employed by PBMS, asked about the difference between CPT code 10040 (acne surgery) and CPT code 10060 (Incision and Drainage) when only a comedone extractor was used, Dimitri informed her that one of the codes was not paid by Medicaid but both were considered "incision and drainage" and could be billed as 10060. Medical assistants, who often performed the actual services described in this complaint, were also taught by senior providers that "pimple and blackhead treatments" using a comedone extractor were incision and drainage procedures.

73. New midlevel providers were instructed that they would train directly under Dimitri. The providers would follow Dimitri for approximately two weeks at her clinic in Slidell, Louisiana before being assigned to perform services at one of the 13 clinics. After training with Dimitri, these providers often relied on the guidance of more-senior practitioners such as Defendant Orgeron and Defendant Perdomo, who were providing services at the clinics to which they had been assigned.

74. Dimitri trained midlevel providers that "the only way to make money on Medicaid patients is to have them come in every two weeks and see them quick." Medicaid patients were instructed to return every two to four weeks for treatment, irrespective of whether these return visits were medically necessary to treat their conditions. Government payors were then charged for any procedures performed, and often, for a medically unnecessary E&M visit.

75. By example, Dimitri trained midlevel providers to treat acne vulgaris and its accompanying symptoms by (1) administering a glycolic acid peel for which neither the patient nor the government payor was billed, (2) applying 30 seconds of phototherapy, and (3) incising

and draining acne lesions with an acne lancet and a Schamburg comedone extractor, i.e., a "pimple popper", every two to four weeks. The latter was then billed to the government payors as a surgical procedure, CPT code 10060.

76. Dimitri pressured her midlevel providers to find additional and vague diagnoses that would justify billing an E&M code in addition to the procedures performed on any particular date of service.

77. Three days after the United States issued a Civil Investigative Demand ("CID") seeking information about the relationship between E.M. Dimitri, D.O. PMC and Dimitri's myriad limited liability companies involved in the operation of her clinics, Dimitri changed her registration with the respective secretaries of state to remove herself as the sole Member/Manager, naming Constance Smallwood instead. Constance Smallwood is identified elsewhere in Dimitri's response to the CID as an "administrative support" employee of AMSS.

78. According to the sworn responses to that CID, Dimitri Dermatology, which is wholly owned by Dimitri:

a. contracts with AMSS for "Human Resources services," which include employees to perform prior authorizations, call center employees, and employees that perform records retrieval, records management, bookkeeping, inventory management, and credentialing.

b. contracts with DCA for "high level management support to medical clinics and ancillary companies in Louisiana and Mississippi," which include "direct management of contractors and outsourced talent, vendors, legal entities, contract review, and financial services."

c. contracts with MSS, a "turn-key, fully-serviced and staffed corporate and medical office space company. . . [that] functions similarly to Regis, which supplies on demand corporate office space to many businesses."

d. contracts with PBMS for medical and billing services; however, Dimitri Dermatology "maintain[s] control of the leased staff management to ensure [billing] integrity[.]"

e. contracts with RSS, which is also a "turn-key, fully-serviced and staffed corporate and medical office space company. . . [that] functions similarly to Regis, which supplies on demand corporate office space to many businesses."

79. From 2016 to 2018, physicians and midlevel providers contracted directly with Dimitri Dermatology. In 2018, the contracts with physicians and providers began to include RSS as a party. Dimitri signed the contracts on behalf of both entities.

80. Under these contracts with physicians and midlevel providers, Dimitri Dermatology, which was solely owned by Dimitri, kept 76% of the payments made by the government payors.

## II. The Fraudulent Scheme

### A. Phototherapy and Photochemotherapy

81. Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, submitted false claims for payment to Louisiana Medicaid, Mississippi Medicaid, Medicare, and TRICARE for medically unnecessary phototherapy and photochemotherapy procedures (collectively, "light therapy") that were performed at subtherapeutic doses and at subtherapeutic intervals on thousands of Louisiana and Mississippi beneficiaries. The vast majority of these claims were submitted for payment under

either Dimitri Dermatology's organizational NPI or TIN, from January 1, 2016 through the date of this filing.

82. Phototherapy uses UV light to reduce inflammation in skin conditions such as psoriasis and atopic dermatitis that are caused by an overreaction of the immune system. Photochemotherapy also uses UV light but involves the pretreatment ingestion of a chemical or the application of a topical agent. Phototherapy is billed under CPT code 96900, while photochemotherapy is billed under CPT codes 96910, 96912 and 96913.

83. Light therapy must be administered two to three times per week in increasing intensity to have therapeutic effect. The dosage required for light therapy to be therapeutic is determined by the skin type or sensitivity of the patient, the specific condition being treated, and the type of UV light being used.

84. Skin sensitivity can be determined by performing a light exposure test to determine a patient's Minimal Erythema Dose or, less formally, by gauging where the individual falls on the spectrum of Fitzpatrick skin types. Fitzpatrick skin types range from I (very fair) to VI (very dark). The goal is to treat the patient with enough light to cause suppression of the disease process without causing undue discomfort.

85. For example, the dose of broadband UVB light to treat a patient with very pale skin is different than the dose necessary to treat the same condition in a patient with very dark skin. The dose of narrowband UVB light necessary to treat these respective patients would differ from the dose required when using broadband UVB.

86. Thus, if the procedures are performed in a therapeutic and effective manner, the medical records of a patient with pale skin should reflect a different dose (expressed as time spent under the UVB light) than the records of a patient with dark skin.

87. The length of time that light therapy should be administered is calculated by dividing the desired dose ($mJ/cm^2$) by the measured irradiance ($mW/cm^2$) of the machine's bulbs. For this reason, the irradiance of the light inside the unit should be recorded weekly and documented in a logbook to which all personnel who prescribe and administer the treatment have access.

88. In her sworn response to a CID issued in August 2023, Dimitri asserted that no logbooks pertaining to light therapy are kept at any of her clinics. She stated that all of the information regarding dosing for light therapy was contained in the patient's medical records.

89. Dimitri Dermatology's physicians, midlevel providers, and medical assistants, acting under Dimitri's direction and guidance, and with her knowledge, administered light therapy with no regard for patient skin type or the long-established guidelines regarding the dosing and frequency necessary to be therapeutic. By example:

a. Between April 10, 2015 and September 5, 2022, Dimitri Dermatology's medical records show that the clinics treated Medicaid beneficiary M.C., an African-American female, 11 years of age during the first visit, at 47 in-person visits. Throughout this timeframe, four distinct Dimitri practitioners treated M.C. At each visit, M.C. was diagnosed with Atopic Dermatitis and Pruritus and, in all but three of the visits, she allegedly received a 30-second photochemotherapy procedure utilizing UVB light and the application of Liquor Carbonis Detergens ("LCD"). All 44 of the photochemotherapy procedures that she received occurred greater than one week apart. The records provide for follow-up visits, but do not instruct her to return within the timeframe necessary for the procedure to be therapeutic. At no point do any of the medical records address the appropriate

dosing for M.C.'s skin type. In October of 2017, Dimitri Dermatology started performing additional procedures to M.C., including "the Dimitri Bundle," addressed *supra* in Section B, which includes (1) a glycolic acid peel for which neither the government nor M.C. were charged, (2) 30 seconds of phototherapy for pruritis, and (3) the alleged incision and drainage of an abscess. Despite no significant change in diagnosis noted in her records, M.C.'s visits after September 5, 2022 did not include photochemotherapy.

b. Between May 3, 2015 and September 27, 2022, Dimitri Dermatology treated Medicaid beneficiary R.D., a Hispanic female who was four years old during her first visit, on 10 separate occasions. Six of the visits included the provision of 30 seconds of photochemotherapy, by exposing her to UVB light after the application of Petrolatum A ("petroleum jelly") or coal tar. The records provide for follow-up visits, but do not instruct her to return within the timeframe necessary for the procedure to be therapeutic. At no point do the medical records address dosing for R.D.'s skin type.

c. Between January 15, 2020 and June 13, 2023, Dimitri Dermatology treated Medicaid beneficiary C.M., an African-American female who was four years old at the time of her first visit, on eight separate occasions. Each of these visits reflect a diagnosis of Atopic Dermatitis, and five of the visits included the provision of 30 seconds of photochemotherapy by exposing her to UVB light after the application of petroleum jelly. Each of the photochemotherapy procedures occurred more than one week apart. The records provide for follow-up visits, but do not instruct her to

return within the timeframe for the procedure necessary to be therapeutic. At no point do the medical records address dosing for C.M.'s skin type.

d. Between January 23, 2019 and March 10, 2022, Dimitri Dermatology treated Medicaid beneficiary J.R., a 45-year-old Caucasian female, on eight separate occasions. Dimitri Dermatology administered photochemotherapy twice; each time at an interval greater than one week apart. The records that accompany her photochemotherapy treatments do not indicate that she should return in a time frame that would render the treatment therapeutic; but rather, they indicate that a follow-up visit should occur two to three weeks later. At no point do the medical records address dosing for J.R.'s skin type.

e. On July 26, 2019, Dimitri treated Medicaid beneficiary T.T., a 33-year-old Asian female. As part of her treatment, Dimitri provided 30 seconds of photochemotherapy, by exposing the affected skin to UVB light after applying petroleum jelly. T.T.'s chart indicated that a follow-up visit should occur in two or three weeks; i.e., not within the timeframe necessary for the procedure to be therapeutic. At no point do the medical records address dosing for T.T.'s skin type.

90. Between January 1, 2016 and June 2024, Louisiana Medicaid paid Dimitri Dermatology at least $2,285,800 for 69,026 claims for photochemotherapy procedures that were administered outside of the timeframe necessary for the procedure to be therapeutic. By example:

| **Beneficiary** | **Repeat 96910 Procedures Performed Greater Than 7 Days Apart** | **Amount Paid** |
|---|---|---|
| TN | 166 | $4,942 |
| KH | 137 | $4,387 |
| EF | 135 | $4,356 |

| | | |
|---|---|---|
| DS | 112 | $3,573 |
| CF | 109 | $4,105 |
| CJ | 99 | $3,838 |
| PC | 98 | $3,406 |
| LP | 94 | $3,043 |
| JA | 92 | $2,545 |
| DA | 90 | $228 |
| NI | 90 | $2,581 |
| LG | 90 | $2,923 |
| MJ | 88 | $3,567 |
| CC | 88 | $3,254 |
| SH | 88 | $3,359 |
| KA | 82 | $3,150 |
| CG | 81 | $3,240 |
| TW | 80 | $3,131 |
| KH | 78 | $1,882 |
| PS | 78 | $3,216 |

91. Between January 1, 2016 and June 2024, Louisiana Medicaid paid Dimitri Dermatology at least $1,129,591 for 114,027 claims for phototherapy procedures that were administered outside of the timeframe necessary for the procedure to be therapeutic. By example:

| Beneficiary | Repeat 96900 Procedures Performed Greater Than 7 Days Apart | Amount Paid |
|---|---|---|
| EF | 143 | $1,439 |
| KH | 141 | $1,402 |
| LV | 136 | $1,362 |
| JD | 113 | $1,119 |
| CJ | 105 | $1,261 |
| CC | 104 | $1,083 |
| KD | 98 | $655 |
| LW | 95 | $775 |
| EC | 93 | $934 |
| YS | 93 | $1,006 |
| ES | 92 | $1,126 |
| CT | 90 | $746 |
| DJ | 89 | $886 |
| BM | 89 | $853 |
| AM | 88 | $677 |
| LM | 87 | $709 |
| TD | 87 | $599 |
| AD | 87 | $857 |
| AL | 86 | $897 |
| JA | 85 | $1,081 |

92. Dimitri Dermatology's practice of repeatedly performing light therapy at subtherapeutic doses and at subtherapeutic intervals was a pervasive practice for all patients at all

clinics that presented with symptoms that could be used to justify the billing of those procedures to a government payor, without regard for medical necessity or efficacy. Upon information and belief, this practice was not limited to the Louisiana clinics or Louisiana Medicaid beneficiaries.

93. From January 1, 2016 to December 31, 2023, Mississippi Medicaid paid Dimitri Dermatology, including and at times billing separately under The Dimitri Clinic Meridian, LLC and/or Shapiro Dimitri Medical, LLC, at least $1,115,734 for 25,760 claims for light therapy procedures that were administered outside of the timeframe necessary for those procedures to be therapeutic.

94. From January 1, 2016 to January 17, 2024, Medicare paid Dimitri Dermatology at least $595,721 for repeat light therapy procedures that were administered outside of the timeframe necessary to be therapeutic.

95. Upon information and belief, from January 1, 2016 to present, TRICARE paid Dimitri Dermatology at least $112,212 for repeat, medically unnecessary, and ineffective light therapy procedures.

**B. The Dimitri Bundle**

96. Dimitri Dermatology's physicians, midlevel providers, and medical assistants, acting under Dimitri's direction and guidance, and with her knowledge, routinely instructed Medicaid patients suffering from acne to return every two-to-four weeks to receive (1) a glycolic acid peel for which neither the beneficiary nor the respective government payors were charged, (2) 30 seconds of phototherapy, and (3) a minor surgical procedure allegedly involving the incision and drainage of an abscess. The practice was so prolific that a former provider referred to it as "the Dimitri Dermatology Bundle."

97. Dimitri Dermatology's physicians and midlevel providers, acting under Dimitri's direction and guidance, and with her knowledge, would then bill Medicaid for phototherapy (CPT code 96900), the incision and drainage of an abscess (CPT code 10060) and, often, an E&M visit appended with Modifier 25. Appending Modifier 25 to the E&M service billed permitted payment to Dimitri Dermatology of these regularly recurring visits because it signaled that "a significant, separately identifiable E&M service above and beyond the specific procedures billed" had been performed, when in fact no such E&M visit had occurred.

98. To justify the billing of phototherapy, Dimitri Dermatology's physicians and midlevel providers claimed that the acne patients experienced pruritis, i.e., dry, itchy skin. Rather than advise the patient to use an emollient (for the dryness) and/or a topical corticosteroid (for the itch), the providers claimed that phototherapy was medically necessary because topical corticosteroids were "comedogenic".

99. To justify the billing of the incision and drainage of an abscess, Dimitri Dermatology's physicians and providers claimed that the acne patients presented with epidermal or sebaceous cysts. They then claimed to "lance" the "lesions . . . w/ [a] sterile lancet" before removing "keratinous debris" with a "Schamberg comedome (sic) extractor[.]" The providers claimed the cysts were "inflamed and irritated".

100. Glycolic acid is a type of alpha-hydroxy acid. It is an exfoliant that removes the top, superficial layer of dead skin cells. Common side effects of glycolic acid treatments can be dryness, mild stinging, and redness. Glycolic acid peels are not reimbursed by any of the government payors because they are considered cosmetic.

101. Pruritis is dry and itchy skin. Pruritis is considered a symptom of other conditions, rather than a standalone diagnosis. The most common and cost-effective treatment for dry, itchy

skin is an over-the-counter topical corticosteroid and/or a moisturizer. Phototherapy is not widely used to treat pruritis but, if it is prescribed, it must be performed two-to-three times per week, in increasing intensity, to be effective.

102. Acne vulgaris is a chronic inflammatory dermatosis which consists of open comedones (blackheads), closed comedones (whiteheads) and/or inflammatory lesions, including papules, pustules, and nodules. Papules are small red bumps. Pustules develop a “head” and contain purulent material. Nodules are also referred to as cysts. Nodular acne is relatively rare and is considered one of the most severe types of acne because it causes hard lumps or knots to develop deep in the skin as bacteria accumulates. These nodules do not usually have a “head” at the center that can be punctured by an over-the-counter tool.

103. CPT code 10060 is defined by the American Medical Association as the “incision and drainage of abscess (e.g., carbuncle, suppurative hidradenitis, cutaneous or subcutaneous abscess, cyst, furuncle, or paronychia); simple or single.” It is a minor surgical procedure that may require a scalpel, anesthesia, and bandaging the wound. At times it may require the prescription of an antibiotic to stave off infection.

104. A Schamberg comedone extractor is a double-ended instrument with a small wire loop on one end and a larger, flattened wire loop on the other end. By placing the loop over the lesion and applying gentle pressure, the extractor forces the debris out from beneath the skin. Extractors are colloquially referred to as pimple poppers, whitehead extractors, and blackhead extractors. They are widely available for retail purchase at stores like Walmart and Walgreens.

105. An acne lancet is tiny sharp point, akin to the head of a needle. It can be used to extract whiteheads or milia. It can also be used to prick the head of a pustule such that the extractor may then be used to express its purulent content by applying pressure. An acne lancet is also widely

available for retail purchase at stores like Walmart and Walgreens, often in conjunction with a Schamberg comedone extractor.

106. The incision and drainage of an abscess under CPT code 10060 involves more than just extracting whiteheads and blackheads, and/or expressing the purulent contents of a pustule:

> the provider makes a circumferential incision over the target area of abscess. He makes an incision through the skin and down to the level of abscess cavity. The provider then opens the abscess and removes the inflamed fatty and dead tissue within the cavity and drains the pus completely. When the provider successfully accomplishes this procedure, he may leave the wound open for continuous discharge of fluids and may use woven cotton cloth to soak up fluids and blood. The provider may use a small surgical clamp to break up any loculations within the cavity and may insert gauze or other material to pack the abscess cavity.

https://www.aapc.com/codes/cpt-codes/10060 (last accessed August 10, 2024).

107. In contrast to the involved surgical procedure described above under CPT code 10060, a procedure under CPT code 10040 is defined by the American Medical Association as "acne surgery (e.g., marsupialization, opening or removal of multiple milia, comedones, cysts, pustules)." The American Academy of Professional Coders describes acne surgery as occurring when:

> the provider opens up or removes acne lesions, such as milia, comedones, cysts, or pustules. For smaller, uncomplicated lesions like comedones, he may remove them mechanically with an extractor . . . . For other lesions, he may use a fine-tipped needle or pointed blade to open up the lesion and remove the contents.

https://www.aapc.com/codes/cpt-codes/10040 (last accessed August 10, 2024).

108. CPT code 10040 is not covered by any of the government payors because it is considered cosmetic.

109. Dimitri Dermatology falsely billed government payors for CPT code 10060 when they were in fact just "popping pimples" with a Schamberg extractor and an acne lancet. By example:

a. Medicaid beneficiary L.T. was identified as an African-American girl who was 16 years old with a chief complaint of acne when she first visited Dimitri Dermatology in April 2017. She was diagnosed with acne vulgaris, pruritis, and epidermal cysts. Her medical records indicate that, from April 2017 until June 2018, L.T. was instructed to return every two weeks, during which time she received (1) a glycolic acid peel for which neither she nor the government was billed, (2) 30 seconds of phototherapy, and (3) the incision and drainage of an abscess. During L.T.'s first visit, the attending practitioner allegedly incised and drained five cysts on her face. L.T. received the exact same procedures every two to four weeks more than 25 times over the next 14 months. At no point do any of L.T.'s medical records (1) address the appropriate dosing for L.T.'s skin type for phototherapy; (2) document the use of anesthesia, or (3) document the use of a surgical tool other than an acne lancet and a Schamberg extractor for the surgical procedures for which Medicaid was billed. Her medical records claim that, above and beyond the procedures administered, the provider spent more than 15 minutes at each visit with her and more than 50% of that time was spent on counseling her about her conditions. This "counseling" allegedly occurred at every visit, every two weeks, for 14 months. For most of these visits, Dimitri Dermatology submitted claims to Louisiana Medicaid for the procedures allegedly performed, as well as an E&M visit appended by Modifier 25, asserting that a significant, separately identifiable

E&M service occurred in addition to the phototherapy and incision and drainage procedures.

b. Medicaid beneficiary S.B. was identified as a 13-year-old Hispanic girl when she first visited Dimitri Dermatology in 2016. According to her medical records, S.B.'s sole request during her initial visit to Dimitri Dermatology was to have a dermatologist check one of her moles. During that visit, however, Dimitri Dermatology diagnosed her with acne vulgaris and pruritis as well. The medical records indicate that S.B. was instructed to return every two weeks. Two weeks later, S.B. received her first Dimitri Bundle: (1) a glycolic acid peel for which neither she nor the government was billed, (2) 30 seconds of phototherapy, and (3) an incision and drainage procedure that allegedly incised and drained seven cysts on her face. Nothing in S.B.'s chart (1) addresses the appropriate dosing for S.B.'s skin type for phototherapy, (2) documents the use of anesthesia, or (3) documents the use of a surgical tool beyond an acne lancet or a Schamberg extractor for the procedures for which Louisiana Medicaid was billed. The records show that S.B. received the Dimitri Bundle 26 times between 2018 and 2020, and always at a frequency that fell outside of the timeframe necessary for phototherapy to be therapeutic. For most of these visits, Dimitri Dermatology also submitted claims to Louisiana Medicaid for an E&M visit and Modifier 25.

c. Medicaid beneficiary D.A. was identified as a 20-year-old Middle Eastern man during his first visit to Dimitri Dermatology in 2010. D.A. originally went to Dimitri Dermatology for treatment of warts. However, in December of 2013 Dimitri Dermatology diagnosed him with acne vulgaris, pruritis, and epidermal

cysts and began to perform the Dimitri Bundle on him. From 2016 to 2017, D.A. would receive (1) a glycolic acid peel for which neither he nor the government was billed, (2) 30 seconds of phototherapy, and (3) an incision and drainage procedure, over 12 times. The treatments occurred approximately two-to-four weeks apart and always at a frequency that fell outside of the timeframe necessary for phototherapy to be therapeutic. Nothing in D.A.'s chart: (1) addresses the appropriate dosing for D.A.'s skin type for phototherapy, (2) documents the use of anesthesia, or (3) documents the use of a surgical tool other than an acne lancet and a Schamberg extractor for the incision and drainage procedures for which Louisiana Medicaid was billed. For most of these visits, Dimitri Dermatology also submitted claims to Louisiana Medicaid for an E&M visit appended with Modifier 25

d. Medicaid beneficiary I.S. was identified as a 11-year-old Caucasian girl during her first visit to Dimitri Dermatology in 2017. She was diagnosed with acne vulgaris, pruritis, and epidermal cysts. The medical records indicate that she was instructed to return every two weeks, during which time I.S. would receive (1) a glycolic acid peel for which neither she nor the government was billed, (2) 30 seconds of phototherapy, and (3) an incision and drainage procedure. From 2018 to 2020, I.S. received the Dimitri Bundle 17 times, and always at frequency that fell outside of the timeframe necessary for phototherapy to be therapeutic. Nothing in I.S.'s chart (1) addresses the appropriate dosing of her skin type for phototherapy, (2) documents the use of anesthesia, or (3) documents anything other than an acne lancet and a Schamberg extractor for the procedures for which Louisiana Medicaid

was billed. For most of these visits, Dimitri Dermatology also submitted claims to Louisiana Medicaid for an E&M visit appended with Modifier 25.

e. Beneficiary A.E. was identified as an 11-year-old Caucasian girl when she was first treated by Dimitri Dermatology in 2016. Upon being diagnosed with acne vulgaris, pruritis, and epidermal cysts, A.E. began to receive (1) a glycolic acid peel for which neither she nor the government was billed, (2) 30 seconds of phototherapy and, (3) an incision and drainage procedure. A.E. received the Dimitri Bundle 9 times between 2016 and 2019. The medical records indicate that A.E. was instructed to return every two weeks. Nothing in A.E.'s chart: (1) address the appropriate dosing of her skin type for phototherapy, (2) documents the use of anesthesia, or (3) documents the use of a surgical tool other than an acne lancet and a Schamberg extractor for the procedures for which Louisiana Medicaid was billed. All of her visits occurred at a frequency that fell outside of the timeframe necessary for phototherapy to be therapeutic. For most of these visits, Dimitri Dermatology also submitted claims to Louisiana Medicaid for an E&M visit appended with Modifier 25.

f. Dimitri Dermatology billed Louisiana Medicaid at least $295 for every single visit at which an incision and drainage procedure and phototherapy were allegedly performed on a patient.

110. Between January 1, 2016 and June 2024, Louisiana Medicaid paid Dimitri Dermatology $4,073,242 for at least 70,941 claims for surgical incision and drainage procedures that were allegedly repeated on the same beneficiaries three or more times. By example:

| **Beneficiary** | **Repeat 10060 Procedures** | **Amount Paid** |
|---|---|---|
| EF | 119 | $6,440 |
| ES | 86 | $5,640 |
| KC | 92 | $5,587 |
| JW | 81 | $5,525 |
| CD | 76 | $5,175 |
| AM | 87 | $5,102 |
| YS | 82 | $4,797 |
| AL | 84 | $4,669 |
| TD | 81 | $4,564 |
| VJ | 72 | $4,399 |
| TW | 68 | $4,355 |
| SH | 70 | $4,198 |
| DT | 69 | $4,132 |
| KH | 76 | $4,113 |
| RJ | 76 | $4,079 |
| LW | 71 | $3,902 |
| DW | 74 | $3,883 |
| RB | 72 | $3,869 |
| LL | 60 | $3,843 |

111. Dimitri Dermatology's practice of instructing acne patients to return every two-to-four weeks to receive nontherapeutic phototherapy and the incision and drainage procedures that were allegedly performed was a pervasive company practice for all patients that presented with

symptoms that could be used to justify the billing of those procedures to a government payor, without regard for medical necessity or efficacy. Upon information and belief, this practice was not limited to the Louisiana clinics or Louisiana Medicaid beneficiaries.

112. From January 1, 2016 to December 31, 2023, Mississippi Medicaid paid Dimitri Dermatology, including and billing separately under The Dimitri Clinic Meridian and/or Shapiro Dimitri Medical, LLC, $519,076 for 5,936 claims for repeat incision and drainage procedures that were allegedly repeated on the same Mississippi Medicaid beneficiaries three or more times.

113. Upon information and belief, from January 1, 2016 to present, TRICARE paid Dimitri Dermatology $82,626 for medically unnecessary CPT code 10060 procedures that were allegedly performed on TRICARE beneficiaries.

**C. False Documentation and Upcoding**

114. In order to justify the false claims for E&M visits appended by Modifier 25, Dimitri Dermatology's physicians and midlevel providers, acting under her direction and guidance, and with her knowledge, supplemented medical records with any diagnoses they could find — even if those conditions were not pertinent to their visit — to otherwise embellish the nature and the extent of the visit.

115. Upon information and belief, the majority of patients who sought services at Dimitri Dermatology were also diagnosed with pruritis or some other version of dry skin, even when their primary diagnosis, such as eczema or psoriasis, necessarily included the presentation of dry, itchy skin.

116. An analysis of Medicare beneficiaries that sought treatment at Dimitri Dermatology from January 2016 to March 2022 indicated that more than 61% of the beneficiaries had been

diagnosed with xerosis cutis (extremely dry skin) and 36% had been diagnosed with "other pruritis" (dry, itchy skin).

117. Dimitri repeatedly reprimanded Relator Albores for failing to bill a separate E&M code in addition to the underlying procedure. Dimitri told Relator Albores that if she looked closely enough, she should be able to find issues to justify additional coding.

118. Dimitri instructed Relator Ford to document hypertension on a psoriasis patient who visited Dimitri Dermatology for light therapy upon overhearing that said patient had a history of hypertension. This hypertension was used to justify a separate E&M service on top of the phototherapy procedure, even though no services or counseling pertaining to that hypertension were rendered.

119. Louisiana Medicaid beneficiary D.W.'s medical records underscore Relators' anecdotes:

a. Providers at Dimitri Dermatology treated Medicaid beneficiary D.W. 56 times between April 2016 and February 2019. D.W.'s medical records identify him as a 28-year-old African-American male when he first sought treatment. D.W. was diagnosed with acne vulgaris, pruritis, and epidermal cysts. At nearly every visit, he received (1) a glycolic acid peel for which neither he nor the government payor was charged, (2) 30 seconds of phototherapy, and (3) an incision and drainage procedure. None of his charts: 1) address the appropriate dosing of his skin type for phototherapy, (2) document the use of anesthesia, or (3) document the use of a surgical tool other than an acne lancet and a Schamberg extractor for the procedures for which Louisiana Medicaid was billed. All of his visits occurred at a frequency that fell outside of the timeframe necessary for phototherapy to be therapeutic.

b. Dimitri Dermatology submitted claims for CPT codes 96900, 10060, and an E&M visit appended by a modifier for nearly all of D.W.'s visits for nearly three years. His medical records claim that, above and beyond the procedures administered, the provider spent more than 20 minutes at each visit with him, of which more than 50% of that time was spent on counseling about his conditions.

c. On May 25, 2016, a Dimitri Dermatology provider claimed that she counseled D.W. at length regarding the need for sun protection given his use of a retinoid. D.W. had neither been prescribed, nor was he using, a retinoid.

d. Dimitri Dermatology copy and pasted that same description of "counseling" regarding D.W.'s (nonexistent) use of retinoids at every visit, every two weeks, several times. Dimitri Dermatology continued to submit claims to Louisiana Medicaid for the procedures allegedly performed as well as an E&M visit appended by a modifier.

d. On July 14, 2016, Dimitri Dermatology allegedly began measuring D.W.'s weight, height, resting heart rate, calculating his BMI, and taking his blood pressure at each visit. These measurements were allegedly taken at every visit, occurring every two weeks. Dimitri Dermatology submitted claims to Louisiana Medicaid for all of the procedures allegedly performed, as well as an E&M service appended by a modifier.

e. On March 23, 2017, a Dimitri Dermatology provider claimed that she counseled D.W. on his above normal BMI and dietary management and provided guidance regarding his weight. He was also allegedly provided a "Pre-hypertensive follow-up" plan that merely instructed him to follow up with his primary care

physician. Dimitri Dermatology billed Louisiana Medicaid for the procedures allegedly performed as well as an E&M service appended by Modifier 25. The provider claimed that they spent more than 20 minutes with him, above and beyond the procedures performed, and more than 50% of that time was spent counseling him about his weight.

g. D.W. allegedly received the exact same counseling regarding his BMI and dietary management, every two weeks, for more than five months. During that time, Dimitri Dermatology's provider repeatedly claimed that, in addition to the procedures for which Louisiana Medicaid was billed, they also spent 20 minutes with him, and more than 50% of that time was spent counseling. Dimitri Dermatology submitted claims to Louisiana Medicaid for an E&M service, appended by Modifier 25, for each of these visits in addition to the procedures allegedly performed.

## III. Specific False Statements, False Records, and False Claims

120. This matter involves more than 250,000 false claims for payment, submitted by myriad providers, across 13 clinics located in two states, through Dimitri Dermatology and related entities' organizational NPIs or TINs. An exhaustive iteration of the false claims submitted by each physician named in this suit would require a complaint that spans thousands of pages. To that end, an illustrative sample is provided below and in the accompanying Exhibits.

### A. Defendant Dimitri

121. As stated *supra* at Paragraph 19, Dimitri spearheaded the fraud alleged herein by not only training her providers to repeatedly treat acne and dry, itchy skin in this manner; but also by her own participation in billing the government payors for the same unnecessary medical

services. Additionally, Dimitri is identified as the "Supervising Physician" in the "Clinical Practice Guidelines" signed by every physician assistant that worked at the clinics in the relevant timeframe.

122. From 2016 to 2023, Dimitri submitted, or caused to be submitted, false claims to Louisiana Medicaid for repeat phototherapy and photochemotherapy services that she allegedly, personally performed 6,772 times outside of the therapeutic timeframe.

123. From 2016 to 2024, Dimitri submitted, or caused to be submitted, false claims to Mississippi Medicaid for repeat phototherapy and photochemotherapy services that she allegedly, personally performed 437 times outside of the therapeutic timeframe.

124. From 2016 to 2023, Dimitri submitted, or caused to be submitted, false claims to Louisiana Medicaid for repeat incision and drainage procedures that she allegedly, personally performed 2,081 times.

125. From 2016 to 2024, Dimitri submitted, or caused to be submitted, false claims to Mississippi Medicaid for repeat incision and drainage procedures that she allegedly, personally performed more than 90 times.

126. In so doing, Dimitri, in her individual capacity, knowingly created false statements and records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI/TIN. Specifically:

a. From 2016-2018, Beneficiary C.D. received an incision and drainage procedure 36 times. Dimitri personally performed the "Dimitri Bundle" on the beneficiary eight times. The remaining 28 incision and drainage procedures were performed by other Dimitri Dermatology physicians and midlevel providers. Not only did Dimitri personally engage in the same conduct as the other treating

provider during those eight visits; she also had access to all of the beneficiary's medical records, including prior medical treatments and diagnoses, entered by the prior provider. At no point did Dimitri call into question the manner in which the patient was being treated. During the eight visits in which Dimitri allegedly performed both phototherapy and an incision and drainage procedure, Dimitri Dermatology billed Louisiana Medicaid $295 per visit. Dimitri knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN for CPT codes 10060 (incision and drainage) and 96900 (phototherapy) between January 6, 2016 and October 25, 2017, for 11 visits occurring approximately two-to-four weeks apart. *See* Exhibit 1.

b. Beneficiary S.P. was treated by a Dimitri Dermatology physician assistant more than 29 times from May 2019 to January 2024, allegedly receiving phototherapy and incision and drainage procedures every two to four weeks. Although the majority of the visits occurred with a physician assistant, Dimitri did personally treat S.P. on June 30, 2021 and July 14, 2021. Not only did Dimitri personally engage in the same conduct as the midlevel provider during those two visits; she also had access to the medical records that were entered by the prior provider. At no point did Dimitri call into question the manner in which the patient was being treated. During both of those visits, Dimitri allegedly administered an incision and drainage procedure, for which Dimitri billed Louisiana Medicaid $220 per visit. Dimitri knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN

for CPT code 10060 (incision and drainage) on the visits that occurred on June 30, 2021 and July 14, 2021. *See* Exhibit 2.

**B. Defendant Orgeron**

127. As stated *supra* at Paragraph 20, Orgeron participated in the fraud through the direct administration of unnecessary medical services and the training/guidance of less-experienced midlevel providers.

128. From 2016 to 2023, Orgeron submitted, or caused to be submitted, false claims to Louisiana Medicaid for repeat phototherapy and photochemotherapy services that he allegedly, personally performed 7,965 times outside of the therapeutic timeframe.

129. From 2016 to 2024, Orgeron submitted, or caused to be submitted, false claims to Mississippi Medicaid for repeat phototherapy and photochemotherapy services that he allegedly, personally performed 7,873 times outside of the therapeutic timeframe.

130. From 2016 to 2023, Orgeron submitted, or caused to be submitted, false claims to Louisiana Medicaid for repeat incision and drainage procedures that he allegedly, personally performed 839 times.

131. From 2016 to 2024, Orgeron submitted, or caused to be submitted, false claims to Mississippi Medicaid for repeat incision and drainage procedures that he allegedly, personally performed 450 times.

132. In so doing, Orgeron, in his individual capacity, knowingly created false statements and records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI/TIN. Specifically:

a. Beneficiary I.S., an acne patient whose medical records are detailed in Paragraph 109(d), was treated primarily by Orgeron from January 2018 through November

2020. Orgeron knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN for CPT codes 10060 (incision and drainage) and 96900 (phototherapy) between January 10, 2018 and November 18, 2020, for 25 visits occurring approximately two-to-four weeks apart. *See* Exhibit 3.

b. Beneficiary A.H. was a patient diagnosed with Acne Vulgaris, Post-Inflammatory Hyperpigmentation, Epidermal Cysts, Pruritic Disorder NOS, and Other Dyschromia. Orgeron knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN for CPT codes 10060 (incision and drainage) and 96900 (phototherapy) between January 3, 2019 and March 12, 2020, for 32 visits occurring approximately two-to-four weeks apart. *See* Exhibit 4.

c. Beneficiary A.L. was a patient diagnosed with Acne Vulgaris, Epidermal Cysts, and Other Pruritis. Orgeron knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN for CPT codes 10060 (incision and drainage) and 96900 (phototherapy) between January 9, 2019 and November 19, 2020, for 27 visits occurring approximately two-to-four weeks apart. *See* Exhibit 5.

**B. Defendant Perdomo**

133. As stated *supra* at Paragraph 21, Perdomo directly participated in the fraud through the direct administration of unnecessary medical services and the training/guidance of less-experienced midlevel providers. Additionally, Perdomo is identified as the "Back-Up Physician"

in the "Clinical Practice Guidelines" signed by every physician assistant that worked at the clinics in the relevant timeframe.

134. From 2016 to 2023, Perdomo submitted, or caused to be submitted, false claims to Louisiana Medicaid for repeat phototherapy and photochemotherapy services that he allegedly, personally performed 14,149 times outside of the therapeutic timeframe.

135. From 2016 to 2024, Perdomo submitted, or caused to be submitted, false claims to Mississippi Medicaid for repeat phototherapy and photochemotherapy services that he allegedly, personally performed 710 times outside of the therapeutic timeframe.

136. From 2016 to 2023, Perdomo submitted, or caused to be submitted, false claims to Louisiana Medicaid for repeat incision and drainage procedures that he allegedly, personally performed 1,904 times.

137. From 2016 to 2024, Perdomo submitted, or caused to be submitted, false claims to Mississippi Medicaid for repeat incision and drainage procedures that he allegedly, personally performed more than 73 times.

138. In so doing, Perdomo, in his individual capacity, knowingly created false statements and records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI/TIN. Specifically:

a. Beneficiary C.J. was a patient diagnosed with Other Atopic Dermatitis, Acne NEC, Sebaceous Cysts, Pruritic Disorder NOS, and Lichenification. She was treated by both Orgeron and Perdomo a total of 51 times between September 9, 2016 and December 18, 2018. Perdomo allegedly performed phototherapy at every visit, outside of the therapeutic timeframe, and at 15 of the visits he allegedly performed phototherapy, photochemotherapy, and an incision and drainage procedure outside of the therapeutic

timeframe. Both Perdomo and Orgeron knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN for CPT codes 10060 (incision and drainage), 96900 (phototherapy), and 96910 (photochemotherapy) between September 9, 2016 and December 18, 2018, for 51 visits occurring approximately two-to-four weeks apart. *See* Exhibit 6.

b. Beneficiary S.R. was a patient diagnosed with Acne Vulgaris, Epidermal Cysts, Other Atopic Dermatitis, and Lichenification. Perdomo knowingly made false statements or records that caused false claims to be submitted through Dimitri Dermatology's organizational NPI or TIN for CPT codes 10060 (incision and drainage), 96900 (phototherapy), and 96910 (photochemotherapy) between January 11, 2022 and January 24, 2023, for 13 visits occurring approximately two-to-four weeks apart. *See* Exhibit 7.

**Count I**

**Violations of 31 U.S.C. § 3729(a)(1)(A)**

119.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

120.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, presented or caused to be presented false and fraudulent claims for dermatological procedures that were not medically necessary.

**Count II**

**Violations of 31 U.S.C. § 3729(a)(1)(B)**

121.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

122.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, made, used, or caused to be made or used, false records or statements that were material to claims submitted for payment or approval from Louisiana Medicaid, Mississippi Medicaid, Medicare, and the TRICARE program.

**Count III**

**Conspiracy to Violate of 31 U.S.C. § 3729(a)(1)(A) and (B)**

123.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

124.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, conspired to commit violations of the False Claims Act, in further violation of the False Claims Act, 31 U.S.C. § 3729(C).

**Count IV**

**Violations of La. R.S. 46:438.3(A)**

125.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

126.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, presented or caused to be presented false and fraudulent claims for dermatological procedures that were not medically necessary.

**Count V**

**Violations of La. R.S. 46:438.3(B)**

127.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

128.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, used or caused to be made or used false records or statements that were material to false or fraudulent claims by creating, and instructing others to create, false and fraudulent medical records and other documentation used to submit claims for payment or approval from Louisiana Medicaid, Mississippi Medicaid, Medicare, and the TRICARE program.

**Count VI**

**Violations of La. R.S. 46:438.3(D)**

129.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

130.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, conspired to defraud, or attempted to

defraud, the medical assistance programs, through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

**Count VII**

**Violations of La. R.S. 46:438.3(E)**

131.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

132.

Defendants, and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, presented or caused to be presented false and fraudulent claims for dermatological procedures that were not medically necessary.

**Count VIII**

**Unjust Enrichment**

133.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

134.

As a result of the actions of Defendants and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, have been unjustly enriched and profited and received monies to which they are not entitled by contract or otherwise. In equity and good conscience, Defendants should not retain these monies.

**Count IX**

**Payment by Mistake**

135.

Plaintiffs reassert and reallege the contents of paragraphs 1-138.

136.

As a result of the actions of Defendants and Dimitri Dermatology's physicians and midlevel providers, acting at Dimitri's direction and guidance, and with her knowledge, the State of Louisiana, the State of Mississippi, and the United States paid the claims submitted for payment in the mistaken belief that the amounts claimed therein were for legitimate, medically necessary treatment even though the claims were not legitimate and were not for medically necessary treatment. As a result, the payment of those claims was by mistake and not authorized by law.

**Prayer For Relief**

WHEREFORE, The United States and the State of Louisiana pray that this District Court enter judgment on behalf of the United States and the State of Louisiana, and against Defendants for:

1. Treble damages of at least $28,344,330 as required by the FCA (Counts I–III) and MAPIL (Counts IV–VII); or alternatively, single damages of at least $9,448,110 for unjust enrichment/payment by mistake (Counts VIII–IX);

2. A civil penalty of no less than $14,308 for each false or fraudulent claim submitted to the government payors as authorized by the FCA and MAPIL;

3. Post-judgment interest; and

4. All other remedies afforded by law and equity.

MICHAEL M. SIMPSON
Acting United States Attorney

Sandra Lee Sears

Sandra Lee Sears
Assistant United States Attorney
650 Poydras St., Suite 1600
New Orleans, LA 70130
Tel: (504) 680-3150
Email: sandra.sears@usdoj.gov

Liz Murrill
Attorney General

_*s/Paolo Messina*______

Paolo Messina (La. Bar No. 26422)
Assistant Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
Tel: (225) 326-6278
Email: messinap@ag.louisiana.gov

_*s/Julie H. Ralph*________

Julie H. Ralph (La. Bar No. 37833)
Assistant Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
Tel: (225) 326-6200
Email: ralphj@ag.louisiana.gov